Merrild AUGSPURGER et al., Appellants,

v.

BROTHERHOOD OF LOCOMOTIVE ENGINEERS, Appellee.

No. 74–1363.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 12, 1974.

Decided Feb. 4, 1975.

James T. Hansing, Thiel, Sorenson & Hansing, Minneapolis, Minn., for appellant.

Harold A. Ross, Ross & Kraushaar, Cleveland, Ohio, for appellee.

Before VAN OOSTERHOUT, Senior Circuit Judge, HEANEY, Circuit Judge, and MEREDITH, Chief District Judge.[*]

HEANEY, Circuit Judge.

The plaintiffs, Division 746 of the Brotherhood of Locomotive Engineers [Union] and seventeen members of that division, brought this action in federal District Court, alleging that the Union had breached its duty of fair representation under the Railway Labor Act, 45 U.S.C. § 151 et seq., in the process of compiling a consolidated seniority roster following the merger of several railway carriers. The District Court dismissed the complaint on jurisdictional grounds, deferring to the primary jurisdiction of the Interstate Commerce Commission [ICC], which had supervised and approved the merger. The court held that the conduct complained of had "its roots in the merger," and that the fair representation doctrine does not apply to disputes arising out of mergers. We hold that the complaint does not state a claim of unfair representation, and that the dismissal was, therefore, proper under the primary jurisdiction doctrine.

In 1967, the ICC approved the merger of the Great Northern Railway, the Northern Pacific Railway, and three of their subsidiaries. Great Northern & Burlington Lines, Inc., Merger, 331 I.C.C. 228 (1967).[1] As a condition of approving any merger, the ICC must "require a fair and equitable arrangement to protect the interests of the railroad employees affected." 49 U.S.C. § 5(2)(f). Accordingly, the ICC ordered that an "employee protective agreement," previously entered into between the railroads and the Union, should be followed. That agreement provided for the consolidation of seniority rosters on an "equitable basis." The power to compile the consolidated roster was given to the Union, subject to acceptance by the new railroad. Existing seniority districts on the various railroads were to be combined into five new seniority districts. The new seniority district involved in this litigation is the Montana-Dakota District, embracing three former districts: the Northern Pacific Fargo West and Yellowstone Districts, and the Great Northern Minot Sixth District.

By late 1967, the Union had prepared four proposals whereby the seniority rosters could be consolidated, and those proposals were offered to the local chairmen for their consideration. In an effort to minimize employee dissatisfaction with the method ultimately selected, the local chairmen circulated the four proposals to the members, asking each member to express his preference. The members were advised that the ballot did not constitute a referendum, but was for the purpose of permitting their local chairmen to have the benefit of their thinking when advising and consulting with the general chairman.

Proposals Nos. 1 and 2 provided for consolidation of the rosters on a date-of-hire basis; those employees with the greatest longevity would have the highest seniority in the new company. Proposals Nos. 3 and 4 were variations of a more complicated system of "percentage block" or "work equity" allocation.[2] For

---

[*] The Honorable James H. Meredith, Chief Judge, Eastern District of Missouri, sitting by designation.

1. That merger became effective pursuant to a Supreme Court decree in 1970, and resulted in the Burlington-Northern Railway. United States v. Interstate Commerce Commission [Northern Lines Merger Cases], 396 U.S. 491, 90 S.Ct. 708, 24 L.Ed.2d 700 (1970).

2. See Price v. Seaboard Coast Line Railroad Co., 332 F.Supp. 1093 (N.D.Ala.1970), aff'd per curiam, 449 F.2d 1371 (5th Cir. 1971), where a similar system was explained and upheld as a fair and reasonable one.

our purposes, it is enough to understand that, under these proposals, a consolidated roster would be constructed using percentage blocks based on the work brought into the consolidated district by each former district. To Proposal No. 3 was attached a "prior right hold-down" restriction, under which an employee could not exercise seniority outside of his former district until he could no longer hold any position therein. On the other hand, Proposal No. 4 embodied an unrestricted application of the percentage blocking allocation method.

The members of the districts which were to become the new Montana-Dakota District expressed a preference for Proposal No. 4, and that method of consolidation was adopted by the Union, agreed to by the Burlington-Northern, and given effect in 1970.

The individual plaintiffs are engineers who were previously in the Northern Pacific Fargo West seniority district. They, too, voted for Proposal No. 4. However, that method turned out to be an unwise choice from their perspective, since the Yellowstone and Minot Sixth Districts had been far more heavily traveled than their own district.[3] As a result, the plaintiffs were given a lower ranking on the consolidated seniority roster than they might have had on a strict date-of-hire basis.

In their complaint against the Union, filed four years after the roster consolidation, the plaintiffs alleged:

* * * [W]hen the * * * plaintiffs * * * voted upon and accepted proposal No. 4, defendant B.L.E. failed and neglected to properly advise the plaintiffs of the meaning and effect of said proposal, and further misrepresented and deceived plaintiffs as to the meaning, effect and application of proposal No. 4, and defendant B.L.E. therefore, has acted in an unfair, invidious, unequal and arbitrary manner toward the individual plaintiffs herein, and has therefore breached its duty of fair representation in the negotiation, administration and enforcement of the collective bargaining contract * * *.

They further alleged that the Union had misrepresented the meaning and effect of the proposal, because an explanation of the proposal circulated to the members contained the following sentence:

* * * This method measures the worth of individual seniority as opposed to other methods recognizing only the equity of the seniority district.

The plaintiffs sought damages in the amount of $500,000 and a declaratory judgment to the effect that the consolidated seniority roster was null and void.

The Union denied that there was anything misleading about the ballot information, insisted that the vote was not a binding one in any event, contended that it had not breached its duty of fair representation, and urged that the complaint failed to state a claim for which relief may be granted. Furthermore, it argued that, even if it had breached its duty of fair representation, such conduct would constitute a violation of the ICC's order and, consequently, the plaintiffs' remedy must lie, if at all, before the ICC. In support of its primary jurisdiction argument, the Union cited 49 U.S.C. § 5(11), which provides that "the authority conferred [upon the ICC] by this section shall be exclusive and plenary."[4] The District Court accepted this latter argument, and held that—even if the plaintiffs stated a claim under the fair representation doctrine—it lacked jurisdiction over the dispute.

---

3. The Northern Pacific Fargo West seniority district brought in 13.43% of the work to the consolidated district, whereas the Great Northern Minot Sixth District had 42.03% of the total and the Northern Pacific Yellowstone District had 44.54%.

4. The supervision of employee consolidation agreements is mandated by a subpart of the same section [§ 5(2)(f)] and hence, is within the scope of § 5(11).

The arguments in favor of invoking the doctrine of primary jurisdiction,[5] thereby requiring the plaintiffs to submit their contentions first to the agency, are strong ones. They have been set out in closely analogous cases involving mergers supervised by the Civil Aeronautics Board. *See, e. g.,* Carey v. O'Donnell, 506 F.2d 97 (D.C. Cir. 1974), cert. denied, 419 U.S. 1110, 95 S.Ct. 783, 42 L.Ed.2d 806 (1975); Kesinger v. Universal Airlines, Inc., 474 F.2d 1127 (6th Cir. 1973); Oling v. Airline Pilots Association, 346 F.2d 270 (7th Cir.), cert. denied, 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339 (1965); Hyland v. United Air Lines, Inc., 254 F.Supp. 367 (N.D.Ill. 1966). The process whereby the CAB and the ICC supervise the merger of carriers is a difficult and lengthy one which would be greatly impeded were disgruntled employees, consumers, and other affected parties permitted to bring lawsuits in other forums. *Cf.* Brotherhood of Locomotive Engineers v. Chicago & North Western Ry. Co., 314 F.2d 424, 431–432 (8th Cir. 1963).

The problem of seniority consolidation is always an obstacle to merger, and the agency must be given a free hand in performing its duty to include labor protective conditions in its merger order:

> Control over seniority list integration is basic to the regulatory scheme administered by the CAB * * *; the success of the merger may be at stake. Uncoordinated, unsupervised attempts to resolve this particularly troublesome problem may result not only in industrial strife, but also in an inefficient or uneconomic operation; the merger, its purposes, and the pub-

lic interest against which it is tested may be threatened. * * *

> This important area of the total complex of merger considerations cannot be subject to independent scrutiny and interference by the courts pursuant to a separate statutory scheme. The parties affected by the CAB merger order cannot be required to answer in different forums at different times on different charges for actions taken under the CAB merger umbrella. * * *

Hyland v. United Air Lines, Inc., *supra,* 254 F.Supp. at 372.

For these reasons, *absent a showing of unfair representation,* we agree with the Sixth, Seventh, and District of Columbia Circuits, that the courts should defer to the primary jurisdiction of the agency when employees only object to the manner in which seniority rosters are consolidated pursuant to a protective condition in a merger approval order.[6] *See* Carey v. O'Donnell, *supra;* Kesinger v. Universal Airlines, Inc., *supra,* 474 F.2d at 1131; Oling v. Airline Pilots Association, *supra,* 346 F.2d at 278.

However, we cannot agree with the District Court that the fair representation doctrine never applies to disputes arising out of mergers, for where that doctrine is properly invoked by a plaintiff, important competing policy considerations come into play. The right to fair representation by the bargaining agent is a right which the judiciary has created by implication from federal statutes. Steele v. Louisville & Nashville R.R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). It is a right primarily and jealously guarded by the judiciary. The Supreme Court was recently faced

---

5. The primary jurisdiction doctrine does not foreclose the door to judicial scrutiny, but determines only which tribunal shall act initially. 3 K. Davis, Administrative Law Treatise § 19.09 at 53 (1958). "Court jurisdiction is not thereby ousted, but only postponed." United States v. Philadelphia National Bank, 374 U.S. 321, 353, 83 S.Ct. 1715, 1736, 10 L.Ed.2d 915 (1963).

6. We are not aware of any circuits which have held to the contrary. In O'Mara v. Erie

Lackawanna Railroad Co., 407 F.2d 674 (2nd Cir. 1969), aff'd sub nom., Czosek v. O'Mara, 397 U.S. 25, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970), the Second Circuit and the Supreme Court held that a complaint was sufficient to state a cause of action under the fair representation doctrine. Even though the union's alleged discriminatory conduct was undertaken during the course of a merger, no claim of primary jurisdiction was mentioned.

with the analogous issue of whether judicial control over fair representation cases should give way to the preemption doctrine[7] of San Diego Building Trades Council v. Garmon, 359 U.S. 236, 245, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), in cases involving conduct which arguably constitutes an unfair labor practice. Despite the strong policies underlying the preemption doctrine, the Court held that the courts should retain jurisdiction in such cases. Motor Coach Employees v. Lockridge, 403 U.S. 274, 301, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971); Vaca v. Sipes, 386 U.S. 171, 180–188, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). It stressed the judicial origins of the fair representation doctrine, the fact that conduct proscribed under the doctrine cannot be adequately regulated by other substantive federal law, the fact that fair representation actions are usually not disruptive of the work which the agency is attempting to perform, and the fact that judicial review of the conduct is ordinarily[8] precluded in those instances in which the General Counsel of the NLRB refuses to issue a complaint. *See* Motor Coach Employees v. Lockridge, *supra,* 403 U.S. at 301, 91 S.Ct. 1909; Vaca v. Sipes, *supra,* 386 U.S. at 182, 87 S.Ct. 903. All of these reasons except for the last one are applicable here.

We are aware that two other Circuits have indicated in dicta an unwillingness to recognize a fair representation exception to the primary jurisdiction doctrine in merger cases. *See* Kesinger v. Universal Airlines, Inc., *supra,* 474 F.2d at 1131–1132; Oling v. Airline Pilots Association, *supra,* 346 F.2d at 278. We acknowledge that the question is a close one. We conclude, however, that it is not proper to invoke the doctrine of primary jurisdiction in a *genuine* fair representation action, even though the disputed conduct arose out of an agency approved merger.[9]

This conclusion does not end the matter, however, for in order to bring himself within the exception to the primary jurisdiction doctrine, the plaintiff must state a claim sufficient to invoke the fair representation doctrine. Precisely because it is an exception to a rule with strong interests of its own, the fair representation doctrine must be defined with sufficient narrowness so that the exception does not emasculate the rule. The Supreme Court stressed this in Motor Coach Employees v. Lockridge, *supra* at 301, 91 S.Ct. at 1925:

> * * * If, however, the congressional policies Garmon seeks to promote are not to be swallowed up, the * * * distinction * * * between honest, mistaken conduct, on the one hand, and deliberate and severely hostile and irrational treatment, on the other, needs strictly to be maintained.

Long before *Lockridge,* it was recognized that the fair representation doctrine set forth in *Steele* and in Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), is a limited one. While the Court in those cases was concerned that minorities be protected from hostile discrimination, it rec-

7. *Garmon* held that unfair labor practice actions must be commenced in the NLRB. The doctrine is properly classified as one of preemption, rather than primary jurisdiction, because the General Counsel of the NLRB has discretion to refuse to institute an unfair labor practice complaint—a discretion which is ordinarily unreviewable. *See* Vaca v. Sipes, 386 U.S. 171, 182, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). *But see* note 8, *infra.* In those cases in which he exercises that discretion, the jurisdiction of the judiciary is not simply postponed, but is ousted. *Compare* note 5, *supra.*

8. The discretion of the General Counsel in this respect is broad, but not necessarily absolute. *See* N.L.R.B. v. International Brotherhood of Electrical Workers, Local 357, 445 F.2d 1015, 1016 n.2 (9th Cir. 1971), which indicated the possibility of judicial review if the General Counsel's action is "wholly without basis in law." *See also* Braden v. Herman, 468 F.2d 592, 593 (8th Cir. 1972), cert. denied, 411 U.S. 916, 93 S.Ct. 1546, 36 L.Ed.2d 308 (1973).

9. This conclusion is consistent with what actually took place in Czosek v. O'Mara, 397 U.S. 25, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970), where the primary jurisdiction issue was ignored. *See* note 6, *supra.*

ognized that "the complete satisfaction of all who are represented is hardly to be expected," *id.* at 338, 73 S.Ct. at 686, and declared that the doctrine is not triggered simply because a contract "may have unfavorable effects on some of the members of the craft represented." Steele v. Louisville & Nashville R.R. Co., *supra,* 323 U.S. at 203, 65 S.Ct. at 232.

 In order to state a claim of unfair representation, the plaintiff

* * * must have more than conclusory statements alleging discrimination. In particular plaintiffs must make a showing that the action or inaction * * * complained of was *motivated* by bad faith, for the gravamen of the rule is "hostile discrimination." An allegation that certain conduct of the [Union] * * * is "invidious" and "discriminatory", without a concomitant identification of lack of good faith, will not set forth a claim sufficient to call for the use of the Steele doctrine. * * *

Gainey v. Brotherhood of Railway & Steamship Clerks, 313 F.2d 318, 323 (3rd Cir. 1963) (emphasis supplied).

*See, also,* Kesinger v. Universal Airlines, Inc., *supra,* 474 F.2d at 1131–1132; Lusk v. Eastern Products Corp., 427 F.2d 705, 708 (4th Cir. 1970); Slagley v. Illinois Central Railroad Co., 397 F.2d 546, 552 (7th Cir. 1968); Balowski v. International Union, United Automobile, Aerospace & Agricultural Implement Workers, 372 F.2d 829, 835 (6th Cir. 1967); Hardcastle v. Western Greyhound Lines, 303 F.2d 182, 185 (9th Cir.), cert. denied, 371 U.S. 920, 83 S.Ct. 288, 9 L.Ed.2d 229 (1962); Cunningham v. Erie Railroad Co., 266 F.2d 411, 417 (2nd Cir. 1959). Specifically, it has been held that, to challenge seniority rearrangements under the doctrine, an essential element is "a bad faith motive, *an intent to hostilely discriminate* against a portion of the union's membership." Hardcastle v.

Western Greyhound Lines, *supra,* 303 F.2d at 185 (emphasis supplied).

 We have examined the complaint carefully, and conclude that the plaintiffs have failed to state a claim sufficiently within the fair representation doctrine to invoke the exception to the primary jurisdiction doctrine. The complaint does not allege that the Union's actions were intentional, were hostile to any class of persons, or were undertaken with the deliberate purpose of benefiting other employees in the district. Rather, the complaint speaks of neglect, or carelessness, in the wording accompanying Proposal No. 4. The Ninth Circuit has held that negligent conduct on the part of the Union is not enough to invoke the fair representation doctrine. Dente v. International Organization of Masters, Mates & Pilots, Local 90, 492 F.2d 10, 12 & n.3 (9th Cir. 1973), cert. denied, 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974). *But see id.* at 12–13 (Browning, J., concurring). Moreover, the vote here was simply an advisory one, and the plaintiffs do not contend that a referendum was required by law. Nor were adequate facts alleged to support an inference of bad faith or discriminatory intent.[10] The alleged misrepresentation occasioned by one sentence in Proposal No. 4 is doubtful, and is certainly not of a magnitude to indicate bad faith. As we read it, the meaning of the disputed sentence is that, under Proposal No. 4, unlike No. 3, a person is not locked into his own prior district's jobs before he can go elsewhere. This is an accurate statement. Moreover, Proposal No. 4 refers the reader to Proposal No. 3, and the example in Proposal No. 3 clearly shows that a person with an earlier date of hire might be adversely affected if his prior district had been a less active one. The further allegations that the Union acted "in an unfair, invidious, unequal and arbitrary manner" toward the plaintiffs are mere conclusions of law, plainly insufficient under Federal

10. The Supreme Court has held that seniority rosters need not be limited to strict date-of-hire methods. Ford Motor Co. v. Huffman, 345 U.S. 330, 342, 73 S.Ct. 681, 97 L.Ed. 1048 (1953). Therefore, the mere fact that another method was chosen and that plaintiffs may have been hurt by that choice is not sufficient to invoke the *Steele* doctrine.

Rule of Civil Procedure 8(a). *See* Slagley v. Illinois Central Railroad Co., *supra,* 397 F.2d at 552.

▉ The thrust of the plaintiffs' case is that the order of the ICC approving the merger has not been complied with.[11] *Cf.* Oling v. Airline Pilots Association, *supra,* 346 F.2d at 278. It is for the ICC to determine in the first instance whether its own order has been carried out. Therefore, we affirm the District Court's decision to decline jurisdiction and dismiss the complaint. Once the ICC has passed on the plaintiffs' claim, they will have ample opportunity to seek review in the judicial branch.[12]

Affirmed.

11. The Supreme Court has held that, when the ICC adopts or approves a pre-merger employee protective agreement, as it did here, compliance with that agreement becomes a condition of the ICC's approval of the merger. Norfolk & Western R. Co. v. Nemitz, 404 U.S. 37, 43, 92 S.Ct. 185, 30 L.Ed.2d 198 (1971). To the extent that the plaintiffs complain of the *result* of the seniority roster consolidation, therefore, they are claiming that the order of the ICC has not been complied with.

Plaintiffs' counsel urged at oral argument that the Court should not "consign these members' rights to a slag heap" in the ICC. Although we are not at all satisfied with the pace at which the ICC moves, we do not agree that such would be the result of the District Court's ruling. The ICC apparently took seriously its duty to protect employees here, for it rejected the first merger application, giving as one of its main reasons the fact that the merger would result in a net loss of about 5,200 jobs. One of the reasons cited for changing its earlier position was the fact that the pre-merger agreement incorporated into the 1967 approval order provided "attrition type" protection for all employees, so that the employees "would receive guarantees and job assurances for the rest of their working lives." Great Northern & Burlington Lines, Inc., Merger, 331 I.C.C. 228, 276–278 (1967).

12. If the employees are denied relief by the ICC, they may obtain judicial review by a three-judge court under 28 U.S.C. §§ 2321–2325, with direct appeal to the Supreme Court under 28 U.S.C. § 1253.