Charles J. ANDERSON et al., Plaintiffs,

v.

UNITED PAPERWORKERS INTERNATIONAL UNION, AFL–CIO and its affiliated Local Union # 776, Defendant.

Civ. No. 5–76–2.

United States District Court,
D. Minnesota,
Fifth Division.

Jan. 17, 1980.

Michael I. Cohen, Duluth, Minn., for plaintiffs.

Steven L. Reyelts, Duluth, Minn., for defendant.

## ORDER

MILES W. LORD, District Judge.

This matter came before the Court on defendant's motion for judgment NOV or, in the alternative, for a new trial. At the hearing on March 22, 1979, this Court requested additional memoranda, and took the matter under advisement. The parties have submitted those additional moving papers, and the Court, having reviewed the entire file and all relevant memoranda, is prepared to rule.

## I. FACTS

This matter was tried before a 12 member jury from January 15 through January 26, 1979. The jury returned a verdict of $37,302.80 and additionally determined that $15,750.00 in punitive damages be awarded in favor of the plaintiffs. During the trial on the merits, conflicting testimony was introduced and appropriately weighed by the jury. For the purpose of disposing of this matter, the Court finds the following as the operative facts in the case:

WK Manufacturing Company, Inc. (hereinafter the "Company") was engaged in the manufacture of accessory parts for automobiles and operated a plant in Mt. Clements, Michigan, as well as in Duluth, Minnesota.

In 1960, the employees of the Company designated the predecessor organization of the United Paperworkers' International Union, AFL–CIO (hereinafter the "International Union") as its collective bargaining representative in an election conducted by the National Labor Relations Board pursuant to Section 9 of the National Labor Relations Act, as amended, 29 U.S.C. §§ 151–68 (1976). Following that election, the employees became members of Local 776 of the International Union, a local which also took into membership the employees of Superwood Corporation, in Duluth, Minnesota.

Carl Gear served as representative of the International Union in the geographic region which included the Company's Duluth plant. Among his principal duties were the negotiation, administration, and enforcement of the successive collective bargaining agreements entered into by the International Union and the Company during the period 1960 to the date of the Duluth plant closing in April, 1975. Mr. Gear performed similar services and functions, and had responsibility for other local unions covered by collective bargaining agreements with various employers within his assigned geographical region. Union member employees of the Company elected two representatives to serve as stewards who participated in the negotiations of successive collective bargaining agreements, and who were responsible for the first stage of the grievance procedure provided by the collective bargaining agreements. Stewards were elected by majority vote of the WK union member employees, from time to time, and possessed no special qualifications or expertise in union-management negotiation skills or collective bargaining negotiation techniques. Also participating in the negotiations process was the president of Local 776, a Superwood employee, whose function in the negotiations procedure was to forward agenda matters received from the WK union member employees, to Carl Gear, the International Union representative.[1]

---

1. Carl Gear testified at great length on the specific procedures followed in the negotiating process, the labor laws, rules and regulations which governed such negotiations, and demonstrated considerable expertise and extensive knowledge of labor relations law as it pertained to the negotiation of collective bargaining agreements, based on his experience as a labor

Testimony was introduced establishing that Carl Gear was the only contact these plaintiffs had with the International Union during their employment by the Company, and that from the point of view of the plaintiffs, Carl Gear was the International Union. It is undisputed that Carl Gear was acting as the authorized agent of the International Union in his dealings with the WK employee members of Local 776 and his dealings with the Company.

The spokesman for union member employees at the negotiations for successive collective bargaining agreements was Carl Gear. Neither the elected stewards nor the local union presidents directly negotiated the terms, provisions or conditions of the proposed agreements with Company representatives. While each of the local union presidents testified that he was generally familiar with the contract provisions, each stated that he was more concerned and more familiar with the Superwood contracts and that Carl Gear was the key negotiator. Under the leadership of Carl Gear, as International Union representative, union member employees of the Company approved by secret ballot various collective bargaining agreements between the years 1960 and 1974.

A severance pay provision appeared for the first time in the 1963 Union-Company contract. It provided for severance pay in the event that the employees lost their jobs due to the Duluth plant ceasing operations. This provision was continued in successive agreements, unchanged, until amended in 1968 to provide severance pay for loss of employment due to automation in addition to plant closing. In 1974, the severance pay provision was further amended to place a "cap" on the maximum amount of credited service entitled to accrual as severance pay for any employee. These successive severance pay provisions were incorporated into the respective collective bargaining agreements.

The various collective bargaining agreements, and particularly the agreement covering the contract period 1974–1977, also provided for paid vacations in accordance with a formula based on years service and hours worked in a given contract year. In addition, the 1974–77 collective bargaining agreement provided for one floating holiday to each company employee covered by the agreement, as a separate and distinct benefit.

On February 5, 1975, the Company filed a Petition for arrangement proceedings under Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 *et seq.* (1976), and thereafter neither scheduled the vacation and holiday pay earned by plaintiffs as wages entitled to priority on Schedule A–1, nor identified the collective bargaining agreement then in force as an executory contract.

The union member employees' rights to vacation pay, holiday pay, and severance pay were secured to them by the collective bargaining agreement then in force, and prior agreements dating back to 1963. Despite repeated assurances by Carl Gear over the years, and particularly during the negotiations of the 1972–1974 contract and the 1974–77 contract that severance pay would be paid to those so entitled, plaintiffs were not paid.

The testimony established that plaintiffs considered the severance pay provision of the collective bargaining agreements from 1963 on as an essential component of the compensation package offered by the Company and accepted by the employees. The evidence introduced at trial established that the plaintiffs understood from the assurances given by Carl Gear, International Union agent, who was their sole contact with the International Union and the union official in whom they placed their confidence, that the Company was able, financially, to meet this contract provision when it became due. Conflicting testimony was heard by the jury regarding the plaintiffs' reliance upon Mr. Gear's assurances that the Compa-

negotiator and international union representative for more than 20 years. In contrast, the shop stewards were working men of limited education and experience, possessed of no special expertise, and no formal training in labor law.

ny was financially sound, and that their severance pay was secured. The jury verdict represented their belief that plaintiffs had no reason to doubt Mr. Gear's assurances in regard to the security for the severance pay and no reason to suspect that the protection of the severance pay was not as he represented it to be.

The testimony of plaintiffs regarding Gear's representations as to the security and inviolability of the severance pay provision was independently corroborated by two former union member employees who had served as union stewards at the WK plant. Each testified, independently, that the severance pay provision was a major concern of the union member employees throughout the contract periods from 1963, and one testified unequivocally that during the 1972 contract negotiations, Carl Gear assured the union member employees that the severance pay obligation of the employer was secure.

The plaintiffs were not present in the contract negotiations between the employer and Mr. Gear in 1963, when the severance pay clause was first introduced into the collective bargaining agreement. Mr. Gear testified that the Company stated it would not establish a security fund protecting the employees' severance pay. From this, the jury determined that Gear knew the Company's position concerning the severance pay question from the outset. This fact was not made known to plaintiffs at any time during the succeeding collective bargaining negotiations. From the testimony introduced at trial, the jury could find that the Union, through Mr. Gear, negotiated what was at best a speculative benefit; that the union members would not have ratified the collective bargaining agreement had they known it was purely speculative; that the entire pay package was tainted to the detriment of these union member employees; and that such bargaining was in bad faith.

The jury could rationally have found that Carl Gear knew, from 1963 on, that the

Company was not setting aside any monies to meet the contractual severance pay obligation; that Carl Gear repeatedly assured them that the money was there, and that plaintiffs relied upon these assurances.

 It is clearly within the duty of the bargaining agent to disclose the Company's intent and financial ability to meet the contractual obligation imposed by the severance pay clause in successive collective bargaining agreements; such a fact has a significant bearing on the employees' decision to accept or reject the Company offer. If the Company could not distribute the severance pay when due, the severance pay provision would be rendered meaningless. It was for the jury to determine, under the peculiar circumstances of this case, whether the International Union representative, Carl Gear, misrepresented the Company's intentions, and whether those representations, if any, altered the Union member employees' position in regard to acceptance or rejection of the collective bargaining agreements. Mr. Gear testified that he made no statements to plaintiffs regarding the existence of a security fund protecting the employees' severance pay. Mr. Gear further testified that the employees displayed no particular concern about the Company's financial stability nor its establishment of a security fund. Mr. Gear's testimony conflicted with plaintiffs' testimony concerning those identical issues. The Court instructed the jury on credibility of witnesses, and the jury could rationally have found that plaintiffs' statement of the facts better represented the actual state of affairs.

## II. DISCUSSION

### Introduction

Defendants have argued that this is not a DFR * case, and that, therefore, this Court may not properly exercise jurisdiction over the matter. This Court is not swayed by defendants' reasoning on this issue. Having reviewed the caselaw generating out of

---

* The DFR is the Duty of Fair Representation Doctrine. Throughout this Order the Court has used the phrase and the abbreviation interchangeably.

the Supreme Court and the Circuits, it seems apparent that there is a growing interest on the part of the judiciary in protecting employees from arbitrary action taken against them by their statutory bargaining representative. *See, Retana v. Apartment, Motel, Hotel & El. Op. U. Loc. No. 14*, 453 F.2d 1018, 1023 and n. 8 (9th Cir. 1972).

■ The cases are clear that both in the negotiation and the administration stages of the collective bargaining process, the DFR doctrine protects the rank and file employee from arbitrary union conduct. The judicially created doctrine mandates that when the Union deals *for and with* its rank and file members, it must act with complete good faith and honesty. *See, Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

■ The instant case is not a garden variety DFR case. The cases cited by counsel in their moving papers are all factually dissimilar to the case at bar. Counsel provided the Court with citations to reported cases which concerned improperly handled employee grievances, and also cases wherein certain classes of employees were discriminated against by their Union in the actual bargaining process. The clear majority of DFR cases concern these two fact patterns—they are administration and negotiation cases. The fact that the instant case is not on all fours with the majority of the reported DFR cases is not particularly telling. This Court has come across several equally unique cases, all of which were properly before other federal courts, and all of which properly asserted claims within the doctrine of the duty of fair representation.[2] This Court finds that it properly entertained jurisdiction over this matter under the DFR doctrine, and further that such was properly placed before the jury for resolution on that issue. This Court finds that the case at bar is a DFR case, and it further finds that the jury verdict on that issue is not contrary to law.

### 1. The Duty of Fair Representation

The DFR is a judicially created doctrine; it was first articulated in *Steele v. Louisville & Nashville R. Co.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). In *Steele*, the Court ruled that a labor union impliedly had a duty to represent fairly all employees within its representative bargaining unit. *Steele* arose under the Railway Labor Act, 45 U.S.C. § 151 *et seq.* (1976), and concerned blatant racial discrimination. The Court reasoned that the union was statutorily given the power to represent all firemen employed by the Railroad, including black fire-

---

2. *See, Retana v. Apartment, Motel, Hotel & El. Op. U. Loc. No. 14*, 453 F.2d 1018 (9th Cir. 1972). *Retana* involved claims properly asserted under the DFR doctrine based upon the Union's failure to (1) provide bilingual liaison between Spanish speaking employees and the Union; (2) provide such employees with a collective bargaining agreement printed in Spanish; (3) explain to the employees their rights under the contract; and (4) provide a bilingual supervisorial system which would assist these employees in carrying out their employment duties.

 The Court of Appeals in *Retana* stated:
The bargaining representative's duty not to draw "irrelevant and invidious" distinctions among those it represents does not come to an abrupt end . . . with the making of an agreement between union and employer. Collective bargaining is a continuous process. Among other things, it involves *day-to-day adjustments in the contract and other working rules, resolution of new problems not covered by existing agreements, and the pro-*

tection of employee rights already secured by the contract. The bargaining representative can no more unfairly discriminate in carrying out these functions than it can in negotiating a collective agreement. 453 F.2d at 1024 (quoting *Conley v. Gibson*, 355 U.S. 41, 46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (emphasis added in part).

 *See, Deboles v. TransWorld Airlines, Inc.*, 552 F.2d 1005 (3d Cir. 1977), wherein the Third Circuit Court of Appeals indicated that a Union which deliberately makes misrepresentations to its rank and file may violate the DFR. The Court of Appeals reversed the District Court's finding of Union liability in *Deboles* on the grounds that plaintiffs in that case failed to establish a causal link between the Union misrepresentations and the plaintiff's injuries. *Id.* at 1017–18. There is no such missing element in the instant case.

 *See also, Williams v. Pacific Maritime Assn.*, 384 F.2d 935, 938–40 (9th Cir. 1967). *See generally, Boyce, Fair Representation, The NLRB & The Courts* (1978).

men. The Court ruled that as long as the union discriminated against its black members on the basis of race, these persons were not fairly represented. The Court created and simultaneously found the union to have violated the Duty of Fair Representation (DFR). 323 U.S. at 202, 207–08, 65 S.Ct. 226.[3]

The DFR doctrine, since its inception in *Steele* has continued expanding. In *Ford Motor Co. v. Huffman*, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), the Court was faced with a pre-employment seniority credit scheme, whereby greater seniority was given to certain employees who had actually begun working at Ford after the complaining employees. The newer employees were given higher seniority based upon their prior military service. The Court ruled that the duty of fair representation had not been breached. The standard by which the union's action was judged was a "reasonableness" test. 345 U.S. at 342, 73 S.Ct. 681. The Court stated:

A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.

*Id.* at 338, 73 S.Ct. at 686. *Huffman* arose within the context of the negotiation stage of the collective bargaining process.

■ The duty of fair representation, however, does not end at the negotiation stage. In fact, a union's discretion is substantially less broad in its duty to *administer* a negotiated agreement.[4] In the landmark case of *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903 (1967), the Court tested a union's decision not to arbitrate an employee's grievance. The Court ruled that the union had violated its duty of fair representation and further clarified the *Huffman* reasonableness standard stating:

It is now well established that, as the exclusive bargaining representative of the employees in Owens' bargaining unit, the Union had a statutory duty fairly to represent all of those employees, both in its collective bargaining . . . [and] in its enforcement of the resulting collective bargaining agreement. . . . Under this doctrine, the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to *exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.*

386 U.S. at 177, 87 S.Ct. at 909–10 (citations omitted) (emphasis added). *See also, Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976).

The Eighth Circuit Court of Appeals, in *Augspurger v. Brotherhood of Locomotive Engineers*, 510 F.2d 853 (8th Cir. 1975), embraced language in *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971), which seemed to indicate that bad faith is a necessary element to a DFR case. 510 F.2d at 859. In *Mavis v. Brotherhood of Ry., Airlines & S.S. Clerks*, 585 F.2d 926 (8th Cir. 1978), the Eighth Circuit reaffirmed its reasoning in *Augspurger, supra*, stating:

The distinction between honest, mistaken conduct, on the one hand, and deliberate and severely hostile and irrational treatment on the other, needs strictly to be maintained.

*Id.* at 931.

Recently, the Eighth Circuit noted that bad faith may not be required in an appropriate DFR case, indicating a shift from its prior case law. In *Ethier v. United States Postal Serv.*, 590 F.2d 733 (8th Cir. 1979), the Court noted that "in an appropriate case, improper motivation may not be re-

---

**3.** The *Steele* case arose under the Railway Labor Act; however, the DFR doctrine was likewise held to have been violated in cases arising under the National Labor Relations Act. *See, Syres v. Oilworkers Local 23*, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785 (1955).

**4.** *See,* Summers, *The Individual Employee's Rights Under The Collective Agreement: What Constitutes Fair Representation?*, 126 *U.Pa.L. Rev.* 251, 254–58 (1977). *See also, Gorman, Basic Text on Labor Law*, at 698 (1976).

quired where perfunctory conduct is alleged and proved." *Id.* at 737, n. 3.

The Court defined "perfunctory" as "without concern or solicitude; indifferent." 590 F.2d at 736. The Eighth Circuit in that case, however, specifically declined to follow the Sixth and First Circuits' lead in holding union negligence to constitute a breach of its DFR.[5]

Finally, in *Smith v. Hussmann Refrigerator Co.*, No. 78–1034 (filed Jan. 3, 1979) (8th Cir. 1979), filed one week before *Ethier, supra*, Chief Judge Gibson reasoned:

> Honesty and good faith are not sufficient to defend against a charge of unfair representation if the union's conduct is otherwise arbitrary or discriminatory, . . nor must a jury necessarily find substantial evidence of fraud, deceitful action or dishonest conduct to conclude that a union breached its duty of fair representation.

*Id.* at 27.

The instant case presents a new twist to this area of the law. In the case at bar, the jury found that the Union had bargained for a straw benefit—the severance pay provision—and misrepresented to the rank and file that it was as secure as the Rock of Gibralter; once the provision had been bargained for and amended, the Union never informed the impacted employees as to the true effect of the provision.

. This case does not specifically fit into either the "negotiation" cases nor the "administration" cases. It would appear to be a hybrid of the two classes; the Union

negotiated a meaningless benefit and, once negotiated, it not only failed to inform the employees of its significance through its administration, but is also misrepresented the true effect of the negotiated benefit.

The defendant has argued that the DFR provides employees protection only in situations where the Union harms the rank and file through its direct dealings with the Company. Since here the Union harmed its employees directly, and not through any ancillary dealings with the Company, the DFR has no application. This Court is not persuaded by that argument.

It is crystal clear that the rank and file are the beneficiaries of the DFR. Accordingly, what sense would it be to suggest that the DFR affords protection where the employees are indirectly harmed but not where they are harmed directly? The DFR was created to protect individual employees from discriminatory, arbitrary or perfunctory treatment by its statutory representative. It therefore applies in the peculiar circumstances of this case.

The facts in the case at bar were presented to a jury, who, under either the "bad faith" standard *or* the apparently less strict "perfunctory" standard, could rationally have found, and did find, a breach of the duty of fair representation.

### 2. *Primary Jurisdiction and Exhaustion*

■ It is clear that where an employee asserts an action alleging a breach of its union's DFR, the primary jurisdiction doctrine does not apply; therefore, this Court properly had jurisdiction to try the case.[6]

---

**5.** *See, Ruzicka v. General Motors Corp.*, 523 F.2d 306 (6th Cir. 1975); *DeArroyo v. Sindicato De Trabasadores Packing*, 425 F.2d 281 (1st Cir. 1970), *cert. den.* 400 U.S. 877, 91 S.Ct. 117, 27 L.Ed.2d 114 (1970).

**6.** In *Smith v. Sheet Metal Workers, Local 25*, 500 F.2d 741 (5th Cir. 1974), the Fifth Circuit reasoned:

> Every Circuit which has faced the question has concluded that the federal courts have subject matter jurisdiction over a bare DFR claim under 28 U.S.C. § 1337, which authorizes federal suits arising under any Act of Congress regulating commerce. The National Labor Relations Act is an "Act of Congress

regulating commerce." *See Capital Service v. NLRB*, 1954, 347 U.S. 501, 504, 74 S.Ct. 699, 702, 98 L.Ed. 887, 34 LRRM 2139. Suit for breach of a duty of fair representation is one "arising under" the National Labor Relations Act within the meaning of § 1337 by virtue of section 9(a)'s dual creation of exclusive power in the bargaining agent to represent all employees in the unit and the correlative obligation to represent those employees fairly in dealings with the employer. *Id.* at 748.

The *Smith* Court noted further:

> 28 U.S.C. § 1337 provides: The district courts shall have original jurisdiction of any civil action proceeding arising under any Act of

*See Vaca v. Sipes*, 386 U.S. 171, 180–81, 87 S.Ct. 903 (1967). *See also Augspurger v. Brotherhood of Locomotive Engineers*, 510 F.2d 853, 857–58 (8th Cir. 1975).

It may well be, as defendant suggests, that the doctrine of exhaustion is well-grounded; however, principles guarding its nonapplication are likewise well-grounded. Defendants argue that to forego exhaustion would deny the union its right to "keep their house in order." The jury's finding reflected that what they needed was a good housecleaning, and it is clear that to enforce intra-union remedial measures in this matter would not aid in such. It would, in fact, require an act of futility on the part of the employees.

█ It is within this Court's discretion to permit plaintiffs to pursue their action in federal court without first exhausting their intra-union remedies. *See, NLRB v. Industrial Union of Marine & Shipbuilding Workers*, 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968). *See also, Buzzard v. Local Lodge 1040 Int'l Assoc. of Machinists and Aerospace Workers*, 480 F.2d 35, 41 (9th Cir. 1973). To order plaintiffs to pursue their grievance on an intra-union level would be to require them to engage in a futile and useless act.

In this case, plaintiffs alleged that the International Union's representative blatantly misrepresented the impact of its collective bargaining agreement; the Union expressly denied that these representations had ever been made. This response is re-markably instructive in revealing the efficacy of the available intra-union remedies.

Finally, the Eighth Circuit, in *Emmanual v. Omaha Carpenters District Council*, 535 F.2d 420 (8th Cir. 1976), noted that exhaustion is generally required if the employer is a party to the action. However, "[n]o exhaustion is required where, as here, the union is the only defendant." *Id.* at 424, n. 4. In the instant case, the union and its local are the only remaining defendants.[7] *See, Beriault v. Local 40, Super Cargoes & Check. of I.L.&W.V.*, 501 F.2d 258, 262 (9th Cir. 1974). *See, Buchholtz v. Swift & Co.*, 609 F.2d 317 (8th Cir. 1979).

### 3. *Punitive Damages*

The jury returned a $15,750 award for punitive damages against the International Union in the instant case. The only issue which reached the jury concerned whether the Union breached its DFR; therefore, the punitive award was necessarily based upon this breach. The question before this Court is: May the jury's punitive damage award stand in light of the Supreme Court's recent ruling in *International Brotherhood of Electrical Workers v. Foust*, 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979).

█ If *Foust* articulated a *per se* rule forbidding punitive damages in *all* DFR cases, then this Court must vacate that portion of the judgment awarding punitive damages. If *Foust* did not create a *per se* rule, or if such a rule applies to only a specific class of cases, then there remains the question whether the punitive award was appropriate in the instant case.

Congress regulating commerce or protecting trade and commerce against restraints and monopolies.
Appellants did not rely on 28 U.S.C. § 1337 in the court below. But federal jurisdiction may be sustained if granted by a federal statute even though such statute is not pleaded or relied upon in the district court. We look to the substance of the complaint, not the labels attached.
*Id.* at 748–49, nn. 5 & 6.
Jurisdiction is proper under 28 U.S.C. § 1337 (1976); the case was submitted to the jury on the issue of fair representation. Therefore, this Court finds it unnecessary to address defend-ant's objections regarding § 301 of the Taft-Hartley Act of 1947.

7. Plaintiffs' original complaint asserted a claim against its employer based upon § 301 of the Taft-Hartley Act, 29 U.S.C. § 185 (1976). This claim was dropped at trial; the only issue which remained in this litigation concerned the International Union's DFR breach. The International Union remained as the only party in this litigation. In fact, WK Manufacturing Co. no longer employs anyone; the Company was adjudged a bankrupt on March 27, 1975. *See, In re WK Manufacturing Co.*, No. 75–90456 H (filed March 27, 1975 E.D.Mich.).

Although Mr. Justice Blackmun, in his concurring opinion,[8] characterized *Foust* as creating a *per se* rule against punitive damages in all DFR cases, 99 S.Ct. at 2128, Mr. Justice Marshall's majority decision did not characterize its holding as such. Furthermore, the Court limited its holding to only those DFR cases where the Union "breaches its duty of fair representation *by failing properly to pursue a grievance.*" 99 S.Ct. at 2128 (emphasis added). It would appear that even if the Court intended to create a *per se* rule in *Foust*, it would apply only where a Union failed to properly pursue a grievance. The instant case is not a garden variety DFR case. In this case, the Union breached its DFR by misrepresenting to its rank and file members the true effect of their severance pay provision; based upon such misrepresentations, the employees consistently ratified successive collective bargaining agreements with the understanding that, under any circumstances, they would receive their severance pay. They would not have ratified the agreements had the true nature of the severance pay provision been revealed.

Since this case does not involve a failure to pursue an employee's grievance, this Court finds the ruling in *Foust* instructive, but not specifically controlling.

■ If *Foust* does not control in this case, then it is apparent that *Butler v. Local Union 823, Int'l. Bro. of Teamsters*, 514 F.2d 442 (8th Cir. 1975), and *Emmanual v. Omaha Carpenters Dist. Council*, 560 F.2d 382 (8th Cir. 1977), control on the question of punitive damages. The Eighth Circuit has reasoned that the Union must engage in "outrageous or extraordinary conduct" in order to award punitive damages. *Butler*, 514 F.2d at 454. This Court finds that the jury could reasonably have determined that the Union's conduct constituted an extraordinary breach of the DFR; the jury's award will not be modified or vacated. Furthermore, it is precisely this type of Union misconduct that a punitive award is made

for; this extraordinary remedy is necessary to deter the International Union from similar future violations.

Accordingly, the judgment is neither modified nor vacated.

### 4. Attorneys' Fees

■ The plaintiffs in the case at bar have moved this Court for an Order awarding attorneys' fees. The motion was made after the close of the trial and after judgment in their favor had already been entered. It is clear that this Court has jurisdiction to entertain the motion "despite the fact that the claim for attorney fees was neither pled nor proven at the trial." *Richardson v. Communication Workers of America*, 530 F.2d 126, 132 (8th Cir. 1976) (*citing Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939)). This Court finds that the power to award attorneys' fees rests within its sound discretion. *Local Union No. 4, Int'l Bro. of Elec. Workers v. Radio Thirteen-Eighty, Inc.*, 469 F.2d 610, 615 (8th Cir. 1972). *See also, General Drivers & Helpers Union Local No. 554 v. Young & Hay Transp. Co.*, 522 F.2d 562, 568 (8th Cir. 1975). The Court finds further that the peculiar circumstances of the case present an appropriate case for an award of attorneys' fees.

The Eighth Circuit Court of Appeals has ruled that attorneys' fees may properly be awarded in § 301 cases where the Union exercises bad faith in representing its rank and file members. *Richardson v. Communication Workers of America*, 530 F.2d 126, 133 (8th Cir. 1976).

The Court of Appeals, in *Richardson, supra*, noted:

In *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), the Supreme Court recognized certain exceptions to the "American rule" that attorney fees are not ordinarily recoverable by the prevailing party in federal litigation absent statutory authorization. These include

---

8. Mr. Chief Justice Burger, Mr. Justice Rehnquist and Mr. Justice Stevens joined in this opinion.

"when the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.' *Id.* at 258–59, 95 S.Ct. 1612."

*Richardson*, 530 F.2d at 132. (citations omitted).

 The Court of Appeals, in *Richardson, supra*, upheld the District Court's Order awarding attorneys' fees. The question before this Court concerns whether such an award is proper in a DFR case. It would seem that the analysis in *Richardson* should equally apply in DFR cases; within the framework of that reasoning, it is apparent that the facts in this case sufficiently warrant an award of attorneys' fees to plaintiffs.

Professor Robert Gorman has aptly indicated that the guidelines articulated in *Alyeska Pipeline Serv. Co., supra*, apply in DFR cases as well as § 301 cases. Professor Gorman has reasoned:

It would appear that such an award of counsel fees will continue to be proper, in the absence of express statutory authorization therefore, even after the decision of the Supreme Court in the Alaska Pipeline case, *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y.*, (U.S.1975). There, although the Court limited the power to award counsel fees when the plaintiff was serving as a "private attorney general," it endorsed such other and distinct justifications for counsel fees as redressing or deterring bad faith by the losing party (which forced the prevailing party to litigate) or as taxing a common fund (i. e., the union treasury) for the plaintiff's rendering of a common benefit to other persons who have contributed to that fund. Most successful unfair-representation actions will fall within either (or both) of these justifications for the award of counsel fees.

*Gorman, Basic Text on Labor Law*, at 724 (West 1976).

Professor Gorman's reasoning rings true in the case at bar. The present action falls within the "bad faith" exception articulated in *Alyeska, supra*. The Court finds that the prevailing parties' reasonable attorneys fees total $20,522.40. This represents 256.53 hours of legal work at $80.00 per hour. The specific breakdown of the hours worked is attached as an appendix hereto.

Accordingly, IT IS ORDERED:

1. Defendants' motions for Judgment Notwithstanding the Verdict or a New Trial are denied.

2. The jury's award for punitive damages is proper and, therefore, the judgment shall not be modified.

3. Plaintiffs' motion for attorneys' fees is granted; plaintiffs' reasonable attorneys' fees total $20,522.40.

### APPENDIX

Plaintiffs' attorneys devoted over 347 hours of work to the preparation and trial of this matter. However, at the insistence of the Union counsel, plaintiffs' attorneys petition for remuneration only for their time spent on the issue that reached the jury. Accordingly, plaintiffs request attorneys' fees for 256.53 hours at Eighty Dollars ($80.00) an hour.

Mr. Louisell logged 106.3 hours on the entire case; one-twelfth of his time was spent on matters unrelated to the issue which reached the jury; he therefore requests remuneration for 98.8 hours.

Mr. Cohen logged 196 total hours; one-third of this allotment was spent on matters wholly separate to the DFR claim. Therefore, he requests payment for 130.61 hours worked.

Mr. Peterman logged a total of 45 hours; five-twelfths of his time was unrelated to the issue which reached the jury. Therefore, he petitions for payment for 27.12 hours worked.

These fees are reasonable; they total $20,522.40.

| DATE | ATTORNEY | DESCRIPTION OF SERVICE | HOURS (NEAREST 0.1 hr.) |
|------|----------|------------------------|-------------------------|
| 10/18/75 | PJL | Conference with Marshall, Musolf, Anderson, and six other men re suit against employer and union | 2.5 |
| 10/30/75 | PJL/MIC | Conference re initiating suit against employer, union, and trustee in bankruptcy | 1.5 each |
| 11/03/75 | MIC | Conference and legal research, Minneapolis, Minnesota with C. Hvass, Jr. of Hvass, Weissman and King, P.A. re breach of DFR and Section 301 suits | 1.5 |
| 11/15/75 | PJL/MIC | Conference with 26 former WK employees re initiation of suit against WK, union, and trustee in bankruptcy | 2.5 each |
| 11/20/75 | MIC | Preparation of plaintiffs' questionnaire; preparation of damages claim form; preparation of contingent fee agreement | 2.0 |
| 11/27/75 | MIC | Letter to 26 plaintiffs re completion of questionnaire, claim form, and execution of individual retainer agreements | .5 |
| 12/05/75 | MIC | Legal research re allegations for federal court jurisdiction, exhaustion of contractual remedies, and preparation of first draft Complaint | 4.0 |
| 02/11/77 | MIC | Review of materials furnished by Clerk of Bankruptcy Court and explanation for failure of plaintiffs to receive notice of proceedings | .5 |
| 04/01/77 | MIC | Reply to inquiry from defendant unions re status of plaintiffs' Answers to defendants' Interrogatories | .2 |
| 01/23/78 | MIC | Conference with 15 plaintiffs in preparation for defendants' depositions | 3.6 |
| 01/24/78 | MIC | Attendance at plaintiffs' depositions taken by defendant union | 7.4 |
| 01/25/78 | MIC/PJL | Conference re testimony of 15 plaintiffs at deposition | 1.5 each |
| 03/25/78 | MIC | Preparation and transmittal of letter status report to Magistrate McNulty | 1.2 |
| 03/26/78 | PJL | Review letter to Magistrate McNulty | .5 |
| 04/07/78 | MIC | Review of defendants' motion to dismiss, motion to strike, and motion for summary judgment | 4.2 |
| 04/07/78 | PJL | Review and consultation with MIC re same | 1.0 |
| 06/03/78 | MIC | Legal research re memorandum in opposition to motion for summary judgment | 8.0 |
| 06/08/78 | MIC | Legal research re memorandum in opposition to motion for summary judgment | 7.2 |
| 06/13/78 | MIC | Legal research re memorandum in opposition to motion for summary judgment | 4.3 |
| 06/14/78 | MIC | Preparation of first draft memorandum in opposition to motion for summary judgment | 3.7 |

| DATE | ATTORNEY | DESCRIPTION OF SERVICE | HOURS (NEAREST 0.1 hr.) |
|---|---|---|---|
| 06/14/78 | MIC/PJL | Conference re first draft of memorandum in opposition and suggested revisions to same | 1.5 each |
| 06/15/78 | MIC | Review of plaintiffs' Answers to defendant Union's Interrogatories; appointments with plaintiffs to execute and acknowledge same | 3.6 |
| 06/25/78 | PJL | Review of memo in opposition | 2.0 |
| 06/27/78 | MIC | Final review of memorandum in opposition to motion for summary judgment; transmittal of same to court and defendants | 1.5 |
| 06/30/78 | MIC | Appearance in opposition to defendants' motion for summary judgment and oral argument before Magistrate McNulty | 1.8 |
| 10/18/78 | PJL | Letter to Judge Lord requesting trial date | .3 |
| 10/23/78 | PJL/MIC | Review of letters from counsel for defendants and Magistrate McNulty re filing of proposed findings | 1.0 each |
| 06/21/76 | MIC | Letter to Federal Bureau of Mediation Services, Washington, D.C. requesting information re participation of federal labor mediator in 1972 WK–Union contract negotiations | .5 |
| 07/06/76 | MIC | Legal research and preparation of memorandum of law in support of motion to compel answers to Interrogatories and production of documents by Union | 1.5 |
| 07/06/76 | PJL | Review of Memorandum of Law | 1.0 |
| 07/09/76 | MIC | Preparation and filing Notice of Motion and Motion to compel discovery | .4 |
| 07/16/76 | MIC/PJL | Hearing on Motion to compel discovery before Magistrate McNulty; granting of plaintiffs' motion compelling discovery | 1.2 each |
| 07/27/76 | MIC | Long distance telephone conference with Earle Earman re application for modification of Order and cooperation of bankruptcy trustee in permitting suit against Union to go forward | .5 |
| 07/29/76 | MIC | Preparation of application for modification of order, brief and supportive application, and proposed order; transmittal of the same for service and filing | 1.7 |
| 08/13/76 | MIC | Letter to attorneys for defendant unions reminding that answers to plaintiffs' Interrogatories had not been received | .1 |
| 09/01/76 | MIC/PJL | Review of defendant Answers to Interrogatories and documents provided pursuant to Rule 34; preparation of objections to same | 2.2 each |
| 09/02/76 | MIC | Letter to defendant unions setting forth objections to Interrogatories and other | |

| DATE | ATTORNEY | DESCRIPTION OF SERVICE | HOURS (NEAREST 0.1 hr.) |
|---|---|---|---|
| | | discovery and demanding full compliance with same | .5 |
| 09/07/76 | MIC | Review of Order modifying Order staying pending of suit from bankruptcy court allowing plaintiffs to proceed against defendant unions | .3 |
| 10/19/76 | MIC/PJL | Conference re defendants' refusal to answer discovery; preparation of Motion, Notice of Motion, and Memorandum of Law in support to compel discovery and for sanctions | 1.5 each |
| 11/03/76 | MIC/PJL | Review of defendants' Memorandum in Opposition for Motion for Sanctions | 1.5 each |
| 11/10/76 | MIC/PJL | Hearing and oral argument in support of Motion to compel discovery, before Magistrate McNulty | 1.5 each |
| 11/17/76 | MIC | Review of discovery materials provided by defendant Unions and preparation of evidence summary for file | 6.0 |
| 11/18/76 | PJL | Review of discovery materials | 2.0 |
| 12/16/76 | MIC | Review of defendants' Interrogatories to plaintiffs; preparation of plaintiffs' worksheets for same; transmittal of worksheets to 26 plaintiffs | 6.0 |
| 02/06/77 | MIC | Review of plaintiff's draft Answers to Interrogatories and claims | 5.0 |
| 02/07/77 | MIC | Letter to Clerk of Bankruptcy Court requesting copies of bankruptcy claims and explanation re failure of trustee to give notice of proceedings, meeting of creditors and hearing on distribution, to satisfy union Rule 33 Interrogatories | .5 |
| 12/06/75 | PJL/MIC | Conference re initial draft Complaint and suggested revisions thereto | 1.5 each |
| 12/07/75 | PJL | Legal research labor relations law | 2.0 |
| 12/20/75 | MIC | Preparation of revised draft Complaint | 1.5 |
| 12/20/75 | PJL | Review of revised draft Complaint | 1.0 |
| 12/27/75 | MIC | Preparation of original Complaint for service | 1.2 |
| 01/06/75 | MIC | Transmittal of Complaint with Summons and U.S. Marshall service to Clerk of U.S. District Court | .2 |
| 01/30/76 | MIC/PJL | Review of defendant union's Answer to original Complaint | 1.0 each |
| 02/06/76 | MIC | Letter to Earle Earman forwarding copy of separate Answer filed by union defendants | .2 |
| 02/24/76 | MIC | Status letter to 26 plaintiffs re filing of Complaint and receipt of answers to same; advising of discovery schedule | .5 |
| 03/30/76 | MIC/PJL | Review of written statement voluntarily provided by Michael J. Burbul, acting | |

| DATE | ATTORNEY | DESCRIPTION OF SERVICE | HOURS (NEAREST 0.1 hr.) |
|------|----------|------------------------|--------------------------|
| | | union steward for WK employees prior to plant closing, in which he categorically asserts that during contract negotiations in October, 1972, at a meeting attended by Carl Gear, a state mediation representative, and Jack D. Kreiff, President of WK, the question of severance pay was raised and Gear informed Burbul that severance pay money was being put into a trust fund and that there was no way the men would not receive severance pay if the company was to go out of business; Gear also informed him that the men would have first option on any sale of machinery if the severance pay was not paid | .5 each |
| 04/05/76 | MIC | Letter to Commissioner, Department of Labor and Industry requesting the name of state labor mediator and other information regarding state mediation services provided to the employer-union negotiations in the Fall of 1972 | .5 |
| 04/07/76 | MIC | Review of letter from Department of Labor and Industry referring this matter to the office of mediation services | .2 |
| 04/08/76 | MIC | Transmittal of request to Bureau of Mediation Services, St. Paul, Minnesota | .1 |
| 04/12/76 | MIC | Preparation of first draft interrogatories to defendant Carl Gear; to defendant Michael Casey; and to defendant unions | 4.0 |
| 06/06/76 | MIC | File review re defendants' Answers to plaintiffs' Interrogatories and status of information from state mediation services | .5 |
| 06/16/76 | MIC | Letter to attorney for defendant unions, Gear and Casey reminding that Answers to plaintiffs' Interrogatories were overdue | .1 |
| 06/16/76 | MIC | Letter to State Bureau of Mediation Services requesting reply to earlier correspondence and explanation | .5 |
| 11/15/78 | MIC | Review of entire bankruptcy file at federal court house, Duluth to obtain summary of facts re severance claims and trial evidence | 4.2 |
| 11/15/78 | MIC | Preparation of proposed findings, first draft | 3.5 |
| 11/17/78 | MIC/PJL | Conference to review draft proposed findings and all discovery materials in support thereof | 2.2 each |
| 11/22/78 | MIC | Letter to Magistrate McNulty re apparent confusion over submission of proposed findings and transmittal of proposed findings | 1.2 |

| DATE | ATTORNEY | DESCRIPTION OF SERVICE | HOURS (NEAREST 0.1 hr.) |
|---|---|---|---|
| 01/05/79 | MIC/PJL | Conference to review Magistrate McNulty's recommendation re granting of partial motion for summary judgment and Judge Lord's confirmatory Order thereof | 1.0 each |
| 01/10/79 | MIC/PJL | Review of defendants' trial memorandum, defendants' motion to amend, defendants' motion to dismiss on various grounds, and trial strategy matters pertaining thereto | 3.0 each |
| 01/14/79 | PJL/MIC | Preparation of plaintiffs' preliminary requests for jury instructions and legal research supporting each request | 6.5 each |
| 01/15/70 | MIC/PJL/ JMP | Trial on the merits with hearings on motions, trial preparation materials, and reply briefs to various defendant union motions | 46.5 JMP<br>67.2 PJL<br>61.5 MIC |
| | | TOTAL | 347.3 |