**AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, Petitioner,**

v.

**DEPARTMENT OF TRANSPORTATION, Respondent,**

**Arthur N. Rogers and Michael J. Baker, Intervenors.**

No. 88–1593.

United States Court of Appeals, District of Columbia Circuit.

Argued April 3, 1989.

Decided July 21, 1989.

As Amended Aug. 24, 1989.

Gary Green, with whom James W. Johnson was on the brief, for petitioner.

Clay Warner, Washington, D.C., also entered an appearance for petitioner.

Thomas L. Ray, Attorney, Dept. of Transp. with whom B. Wayne Vance, Diane E. Liff, Attys., Dept. of Transp., Washington, D.C., were on the brief, for respondent.

David M. Feldman, of the bar of Texas, Fifth Circuit, pro hac vice, by special leave of Court, with whom James R. Layton, Washington, D.C., was on the brief, for intervenors.

Before MIKVA, SILBERMAN and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Opinion concurring in part and dissenting in part filed by Circuit Judge MIKVA.

SILBERMAN, Circuit Judge:

In the summer of 1981, the now-defunct Civil Aeronautics Board ("CAB") approved the merger of Texas International Airlines and Continental Air Lines. Pursuant to its authority to condition its approval upon "such terms and conditions as it shall find to be just and reasonable," 49 U.S.C. App. § 1378(b)(1) (1982), the CAB required the merging airlines to consent to a series of labor protective provisions ("LPPs") which, in turn, obliged the carriers to insure a "fair and equitable" integration of the combining airlines' separate seniority lists. Disputes arising under the LPPs were to be settled by submission to an arbitrator selected from among a group designated by the National Mediation Board.

Two former Texas International pilots, claiming to have been placed unfairly low on the combined seniority list, petitioned the Department of Transportation ("DOT") —CAB's successor in the airline merger arena—to order arbitration of their claims. Finding the pilots' claims "within the scope of the LPPs." DOT directed arbitration. From this final order, the Air Line Pilots Association ("ALPA") petitions for review.

## I.

Until very recently, section 408 of the Federal Aviation Act, 49 U.S.C. App. § 1378 (1982), empowered DOT—and the CAB before it—to review proposed airline mergers and approve them unless it found that the consolidations would "not be consistent with the public interest." *Id.* § 1378(b).[1] The CAB routinely imposed LLPs on the merging carriers as a condition of Board approval. *See Delta–Chicago and Southern Merger Case,* 16 C.A.B. 647 (1952) (announcing standard LPPs). Although the passage of the Airline Deregulation Act of 1978, Pub.L. No. 95–504, 92 Stat. 1705 (1978), prompted the Board to curtail its practice of imposing LPPs, *see National Airlines Acquisition,* 84 C.A.B. 408, 475 (1979); *see also Air Line Pilots Ass'n v. Dep't of Transp.,* 791 F.2d 172, 176–78 (D.C.Cir.1986) (upholding DOT's refusal to impose LPPs), the Board included its standard LPPs as a condition to approval of the 1981 Texas International–Continental merger. The LPPs imposed on the two carriers provide:

Section 3. Insofar as the acquisition affects the seniority rights of the carriers' employees, *provisions shall be made for the integration of seniority lists in a fair and equitable manner, including, where applicable, agreement through collective bargaining between the carriers and the representatives of the employees affected.* In the event of failure to agree, the dispute may be submitted by either party for adjustment in accordance with section 13.

\* \* \* \* \* \*

Section 13(a). In the event that any dispute or controversy (except as to matters arising under section 9) arises with respect to the protections provided herein, which cannot be settled by the parties within 20 days after the controversy arises, it may be referred by any party to an arbitrator selected from a panel of seven names furnished by the National Mediation Board for consideration and determination.

*Texas International–Continental Acquisition Case,* Order 81–10–66, App. A at 1, 8 (Aug. 14, 1981) (emphasis added).

At the time of the merger, the pilots employed by both Texas International and Continental were represented by ALPA. Accordingly, pursuant to section 3 of the LPPs, the two carriers and ALPA agreed to employ the union's internal consolidation procedures in order to integrate the pilots' seniority lists. This process eventually led to an *internal* ALPA arbitration (not the employer-union arbitration contemplated by section 3 of the LPPs) before a panel ("the ALPA panel") composed of two pilots employed by disinterested airlines and an independent labor arbitrator. Representative pilots from each of the merging carriers presented their integration proposals to the ALPA panel, and in July 1983 the panel announced a complex integration award that placed the approximately 1600 Continental and 400 Texas International pilots into nine seniority categories in accordance, variously, with the pilots' date of hire, length of service (computed from a merger cutoff date of November 25, 1981) and premerger expectations concerning equipment, routes, pay, and other conditions.

Michael J. Baker and Arthur N. Rogers, two of the least-senior Texas International pilots, were placed into the ninth or last category which included "recent [Texas International] new hires with [dates of hire] in 1980 or later and [lengths of service] of less than four months as of November 25, 1981." Baker and Rogers, claiming unfair treatment, complained to the union. The pilots argued that the ALPA panel had failed to give full effect to a collective bargaining arbitration decision pre-dating the merger that allegedly granted Baker and Rogers constructive length-of-service credit far in excess of the "less than four

---

**1.** DOT's authority over airline mergers expired January 1, 1989, pursuant to the terms of a 1984 congressional enactment. *See* Pub.L. No. 98–443, § 3(c), 98 Stat. 1703 (1984) (codified at 49 U.S.C.App. § 1551(a)(7) (Supp. IV 1986)). A prior enactment terminated the CAB's role in airline mergers effective January 1, 1985, and transferred all merger authority previously exercised by the Board to DOT. *See* 49 U.S.C.App. § 1551(b)(1)(C) (Supp. IV 1986).

months" service assigned to them by the ALPA panel as of the merger cutoff date.

This earlier award grew out of bitter pre-merger contract negotiations between the union and Texas International in 1980 and 1981. Baker and Rogers were part of a group of twelve pilots hired in the midst of these negotiations—in October 1980—and placed immediately into an airline training program. ALPA members regarded these new hires suspiciously, believing the airline had retained them in order to operate in the event of a strike. Accordingly, the incumbent pilots refused to cooperate with the company in assimilating the new hires into their ranks. Although the new pilots completed their "ground training," a prerequisite to being placed on the pilots' seniority list, shortly before November 19, 1980, the refusal of the incumbent pilots to assist in the training of the so-called "Dirty Dozen" prevented the new hires from completing their required course of instruction. As a consequence, Baker, Rogers and the rest of the Dirty Dozen were essentially furloughed.

ALPA and Texas International subsequently settled their differences and reached a collective bargaining agreement in July 1981 incorporating new job protections for ALPA pilots, including a requirement that Texas International recall all pilots then on furlough. But the seniority list apparently agreed to at that time assigned Baker and Rogers a seniority date of July 30, 1981, which effectively deprived them of the agreement's new protections. When Baker and Rogers were recalled by Texas International (prior to completion of the merger) for a brief period in July 1982, they discovered their postdated seniority and soon thereafter instituted grievances under the collective bargaining agreement against the surviving airline. The matter went to arbitration and the union acted only as an observer.

An arbitrator selected pursuant to the collective agreement held that the two pi-

lots were entitled to the earlier seniority date of November 19, 1980. The employer had attempted to defend its conduct before the arbitrator by claiming that ALPA itself had demanded the wholly artificial (and disadvantageous) seniority date for Baker and Rogers as a condition to entering into a collective agreement in July 1981. The arbitrator skirted the implication of the union's possible breach of its duty of fair representation.[2] Whatever the union's position vis-a-vis the two pilots, concerning which he made *no* findings, the arbitrator determined that the airline was "still ... obligated to abide by the terms of its Agreement." He thus ordered correction of the pre-merger Texas International seniority list, awarded back pay "as if the Grievants had been in active service during the period[ ] ... November, 1980[ ] until December 1, 1981," and "declared that each Grievant would and should have been on active duty line status at least since June 24, 1982."

It is this alleged constructive period of "active service" that Baker and Rogers believe was improperly ignored by the internal ALPA integration panel. As noted, soon after the ALPA panel published its integration decision, the two pilots complained to the union. But shortly thereafter, in September 1983, Continental filed a petition under Chapter 11 of the Bankruptcy Code and rejected its collective agreement with ALPA; the ensuing strike and eventual withdrawal of recognition of ALPA by Continental prevented, according to the union, immediate resolution of the pilots' claims. Baker and Rogers subsequently petitioned DOT for an order compelling arbitration by the airline and ALPA. Simultaneously, the aggrieved pilots filed, in the United States District Court for the Southern District of Texas, a claim alleging that ALPA had breached its duty of fair representation by failing to give effect to the earlier arbitration award in integrating the Texas International and Continental seniority lists.

**2.** The arbitrator, it would appear, was in an awkward position since the arbitration machinery *de facto* stems from the collective bargaining relationship. As such, the arbitrator might have lacked authority to inquire into whether the union had breached its duty of fair representation to Baker and Rogers.

In a series of orders, DOT directed arbitration of the dispute. DOT purported to adopt the prior standards employed by the CAB in reviewing seniority integration disputes, under which arbitration would not be compelled unless the employee could show that the integration "was tainted by the union's breach of its duty of fair representation." Order 85–5–58 at 8 (May 13, 1985). DOT thought the "factual findings" contained in the earlier arbitrator's opinion, together with the ALPA panel's "unexplained failure to follow the [arbitrator's] award," provided "enough evidence of the *possibility* of bad faith" (emphasis added) to warrant compulsory arbitration, and, accordingly, granted Baker and Rogers' request. *Id.* at 9. This petition for review followed.

On March 23, two weeks prior to oral argument in this case, ALPA moved to enjoin Rogers and Baker from further prosecuting their district court action, arguing that our court's prior decision in *Carey v. O'Donnell*, 506 F.2d 107, 110 (D.C.Cir.1974), *cert. denied*, 419 U.S. 1110, 95 S.Ct. 783, 42 L.Ed.2d 806 (1975), commits fair representation claims relating to the integration of seniority lists in airline mergers to the exclusive jurisdiction of DOT in the first instance, and thereafter the courts of appeals. One day later, on March 24, the district court entered its final "Findings of Fact and Conclusion of Law" holding ALPA in violation of its duty of fair representation in connection with the seniority integration. *See Rogers v. Air Line Pilots Ass'n Int'l*, C.A. No. H–84–3985 (Mar. 24, 1989). We held ALPA's motion for injunctive relief in abeyance pending oral argument.

For the reasons stated, we grant ALPA's petition for review and vacate the DOT order compelling arbitration, but we deny its motion to enjoin the pilots' pursuit of their fair representation action in the Texas district court.

## II.

DOT in this case expressly adopted prior Board precedent governing integration disputes and purported to examine the evidence proffered by the two pilots in accordance with the Board's traditional standards:

> [DOT] will apply the Board's standards for determining whether an LPP seniority dispute should be arbitrated, for those standards appear rational, have received judicial approval, and are consistent with other labor law principles. Moreover, no one has proposed the use of different standards in this case.

Order 85–5–58 at 8–9; *see also* Order 88–4–28 at 7 (April 7, 1988) ("Arbitration ordinarily will be granted on an employee complaint against an integrated seniority list accepted by the employee's collective bargaining representative only when there is reason to believe that the union acted in bad faith in constructing the integrated list"); Order 88–6–16 at 4 (June 14, 1988) (same). Nevertheless, ALPA contends that the Board's standards were arbitrarily misapplied by DOT in compelling arbitration here. In the alternative, it is argued that, to the extent DOT deviated in practice from the CAB's prior standards and applied—*sub silentio*—a wholly new test for arbitration of seniority disputes, it did so without adequate explanation. In either event, ALPA contends that the arbitration order cannot stand.

The requirement that merging carriers assure a "fair and equitable" integration of their employees' seniority lists was an important component of the standard LPPs imposed by the Board during its tenure, for it was recognized that the integration process provided a sure source of potentially damaging labor strife were it managed poorly. The Board, however, was under no illusion that resolution of integration questions was simple. It recognized that there was no single "correct" or most-fair method of combining the separate seniority lists of merging airlines. As then-Judge Burger observed in one of the first cases to examine the Board's integration policies, "[n]o general rules can or need be laid down." *Outland v. CAB*, 284 F.2d 224, 228 (D.C. Cir.1960). The range of considerations that legitimately can guide the synthesis of two distinct seniority lists is unquestionably

broad; length of pilot service, pre-merger job descriptions and expectations, and pre-merger compensation are but a few of the many legitimate factors that can be applied. *See id.; see also Ford Motor Co. v. Huffman,* 345 U.S. 330, 338–39, 342, 73 S.Ct. 681, 686, 688, 97 L.Ed. 1048 (1953); *Flying Tiger–Slick Merger Case,* 18 C.A.B. 326, 330 (1954). In truth, the process is more nearly akin to legislation (or interests arbitration) than adjudication (or rights arbitration).

■ In view of the inappropriateness of uniform seniority integration rules, and recognizing its lack of expertise in labor relations matters, the Board drafted the LPPs to place principal reliance for the resolution of integration problems on the collective bargaining process. As the Board explained in the *North Atlantic Route Transfer Case:*

> It is clear to us that we should not undertake to determine the precise manner in which the individual seniority lists for various categories of employees should be merged, or other provision made for the determination of seniority. Such a determination is dependent upon so many factors, and is of such a detailed nature that it would not be practical for an administrative agency such as the Board to undertake the task. It would therefore be more desirable that the task be accomplished by those most directly concerned, the company and the employee groups. It is a matter which lends itself directly to voluntary agreement by negotiation and, failing that, to arbitration. We are therefore providing for such a method of determination [in our standard LPPs].

12 C.A.B. 124, 132–33 (1950), *supplemental opinion,* 14 C.A.B. 910 (1951), *aff'd sub nom. Kent v. CAB,* 204 F.2d 263 (2d Cir.), *cert. denied,* 346 U.S. 826, 74 S.Ct. 46, 98 L.Ed. 351 (1953). Thus, while section 3 of standard LPPs directed "fair and equitable" integration of pre-merger seniority lists, it also provided, where applicable, that this be accomplished through "collective bargaining between the carriers and the representatives of the employees affected." And if collective bargaining under section 3 produced an agreement between union and employer, the Board traditionally accorded the integration plan a strong presumption of substantive fairness. Unless the complaining employees could make a "showing" that the union negotiated the integration plan in bad faith—in other words, that the synthesized list was tainted by the union's breach of its duty of fair representation to the complainants—the Board would not look behind the collectively-fashioned list and independently assess its normative fairness.[3] *See, e.g., United–Capital Merger Case,* 40 C.A.B. 903 (1964), *aff'd sub nom. Outland v. CAB,* 284 F.2d 224 (D.C.Cir.1960). Mere allegations of a breach of the duty of fair representation would not do; although the Board never defined precisely what constituted a "showing," counsel for DOT conceded at oral argument that it had to be at least the equivalent of a *prima facie* case of bad-faith union conduct.

The justifications for this "laissez-faire" approach seem as powerful to us as they did to the Board during its lifetime. Once it is conceded that there is no "correct" formula for integrating two or more seniority lists, and it is recognized that there are a number of organizing principles which can "fairly" be applied to the competing interests of the members of merging bargaining units, one is led to conclude that the consensual determinations of the employer and the employees' lawful representatives should not be disturbed absent compelling circumstances. To automatically direct substantive arbitral review of integration plans at the behest of individual employees who feel their interests have been slighted would itself inject the very sort of instability into airline consolidations that the CAB sought to avoid originally through imposition of the LPPs. And because reexamining a collectively-bargained seniority list is unavoidably a zero-sum

---

**3.** In cases where employees met this exacting standard, the Board would not proceed itself to review the fairness of the seniority list but rather would typically direct arbitration of the employees' claims pursuant to § 13(a) of the LPPs.

game for the class of employees affected—moving a complaining employee higher on the list perforce lowers the relative placement of those leap-frogged by the complainant—we think it reasonable for the Board to have deferred to the collectively-bargained result unless it was presented with strong indications that the employees' collective representatives acted in violation of the trust invested in them by federal labor relations statutes. *See generally Northeast Master Exec. Council v. CAB*, 506 F.2d 97 (D.C.Cir.1974), *cert. denied*, 419 U.S. 1110, 95 S.Ct. 783, 42 L.Ed.2d 806 (1975).

■ Purporting to apply these standards to Baker and Rogers' petition, DOT concluded the record contained "enough evidence suggesting that ALPA may have breached its duty of fair representation" to the two pilots. Order 85–5–58 at 9. DOT focused on two factors. First, DOT found unexplainable the ALPA panel's "fail[ure] to follow the [earlier arbitrator's] conclusion that Rogers and Baker should be treated as if they had been on active service from November 1980 to June 1981." *Id.* Second, DOT thought the arbitrator's "findings" that ALPA's *officials* had "repeatedly tried to frustrate the two pilots' employment potential" at Texas International prior to the merger explained the ALPA panel's decision. *Id.* Since the prior award was not honored by the ALPA panel, DOT inferred that the hostility previously shown to Baker and Rogers by the union infected the ALPA panel's determination to place them at the bottom of the combined seniority list.

A close examination of the record before DOT, however, reveals that Baker and Rogers offered little more than simple allegations. The premise to DOT's conclusion that the ALPA panel failed to explain its refusal to "follow" the earlier arbitrator's award is the notion that there is a necessary inconsistency between the two decisions. We do not think that this is so. The ALPA panel decision may have been in tension with *one interpretation* of the earlier award, but that interpretation is by no means the best or the only reasonable interpretation.

As we noted earlier, the ALPA panel ordered the Texas International and Continental pilots into nine seniority groups classified roughly in terms of date of hire, length of service, and pre-merger job expectations. The two pilots claimed that they belonged in the seventh seniority category, rather than the ninth, ahead of the approximately 400 "furlough-vulnerable" Continental pilots in Group Eight. They argued that their service history was inconsistent with the characteristics of Group Nine. The five pilots in Group Nine, all employed by Texas International prior to the merger, were described by the ALPA panel as "[r]elatively recent . . . new hires with [dates of hire] in 1980 or later and [lengths of service] of less than four months" as of the merger cutoff date of November 25, 1981. Baker and Rogers contended, and DOT appeared to agree, that the arbitrator's prior award of substantial *constructive* line service made it inappropriate to so describe the two pilots. Instead Baker and Rogers believed that they should have been placed in Group Seven among pilots with dates of hire between 1977 and 1979 and adjusted lengths of service of between one and five years.

The thrust of the pilots' argument—and DOT's understanding of the arbitrator's award—is that the arbitrator held "that Baker and Rogers should be treated as if they had been on active service from November 1980 to June 1981." Order 85–5–88 at 9. For then and only then could Baker and Rogers claim the approximately one year of active line service (as of November 25, 1981) that they believed would entitle them to placement in Group Seven ahead of the "furlough-vulnerable" Continental pilots in Group Eight. Yet the "constructive active service credit" alleged by the two pilots does not obviously or even naturally flow from the arbitrator's remedial order. The arbitrator did order correction of the grievants' seniority date to November 19, 1980, the date on which they both would have been placed on the seniority list (although not necessarily activated) had their introductory training gone as planned.

And the two were awarded "make-whole pay" in amounts computed *"as if* [they] had been in active service" from November 1980 to December 1981 (emphasis added). But the arbitrator awarded constructive "active line service" only for periods *after* June 24, 1982, the date when the two pilots would likely have been recalled from furlough had they been assigned a November 1980 seniority date. The arbitrator, moreover, returned Baker and Rogers to airline service as probationary employees, a status we are told is inconsistent with active service greater than one year, constructive or otherwise. Perhaps most tellingly, the only *constructive active-service* relief which the two pilots requested in their arbitration complaint was for periods *after* July 12, 1982. Under the most obvious interpretation of the arbitrator's award, then, Baker and Rogers' cumulative active service as of November 25, 1981 amounted to no more than a few months.

In support of Baker and Rogers' placement, the ALPA panel, in a supplemental opinion, compared the two pilots' credentials to those of the least senior pilot in Group Eight, "whose date of hire was August 13, 1979 and who had 202 days of active service before he ... w[as] furloughed on November 1, 1980, twelve days before [Baker and Rogers] obtained a seniority date." Baker and Rogers' active service as of November 25, 1981 (assuming they had been recalled in July 1981) would have amounted to no more than 119 days. Although the next most senior former Texas International pilot was placed in Group Seven on the combined list, his experience was hardly analogous to that of Baker and Rogers; he had over a year of active service as of the merger cutoff date (and thus

was no longer probationary) and had been hired almost a year earlier than Baker and Rogers in December 1979. Strict respect for the terms of the earlier arbitrator's award, the panel reasoned, was perfectly consistent with placement of Baker and Rogers in Group Nine.[4]

DOT, understandably suspicious about the genesis of the supplemental opinion, refused to credit the panel's belated explanation:

> [T]he panel issued the supplemental opinion three years after the publication of the integrated seniority list and only after ALPA's attorney requested the panel to issue the opinion so that ALPA could use it as a defense to the two pilots' charges in their district court suit that ALPA had breached its duty of fair representation.

Order 88–6–16 at 5. But the panel's supplemental opinion relied in large measure on the logic and plain language of the arbitrator's award, and to that extent it is entitled to some credit. The panel's failure to issue a full opinion promptly, moreover, was attributable to unusual circumstances. Shortly after the integration decision was announced, Continental rejected its agreement with ALPA in bankruptcy and subsequently ceased to recognize the union as the lawful representative of Continental's pilots.

DOT thought that the union members' alleged hostility to Baker and Rogers during their introductory training, as well as the circumstances surrounding the assignment to the two pilots of an erroneous seniority date in 1981, provided further "evidence" that ALPA had breached its duty of fair representation in placing Baker

---

4. DOT argues that date-of-hire and length-of-service factors were not the exclusive determinants of a pilot's placement on the combined seniority list. This is apparently drawn from the ALPA panel's opinion itself:

> [W]hile [length of service] and [date of hire] can be used as guides in setting up groups of pilots to be listed together, the pilots within these groups must be ratioed to obtain an equitable distribution and maintain relative bidding power, as well as to reflect reasonable pre-merger expectations.

ALPA Panel op. at 31. Assuming that such factors as "the vulnerability of the pilots to furlough" and "the bringing of jobs to the merger" played a role in the ALPA panel's categorization of the pilots in Groups Seven through Nine, it is not at all clear, as Baker and Rogers assert, that these factors cut in their favor. Baker and Rogers were furloughed at the time of the merger, and they were not recalled until well after the merging carriers had combined their operations. Thus, it cannot be said in any meaningful way, on the present record at least, that the two pilots brought jobs to the merger.

and Rogers at the bottom of the integrated seniority list. The earlier arbitrator's opinion was thought to provide support for this inference, but, it will be recalled, the arbitrator expressly refused to reach any conclusions regarding the union's conduct. Any union bad faith would not, in his view, have excused the employer's breach of the collective bargaining agreement charged by Baker and Rogers. In any event, any hostility on the part of other pilots that may have been "in the air" in 1981, assuming it could be imputed to ALPA officials, *see* 29 U.S.C. § 106 (1982) (union officials not responsible for conduct of union members absent official authorization, participation, or ratification), would seem to bear, at best, a tenuous connection to the ALPA panel's decision in 1983. There was no evidence before DOT linking the "hostility" testified to before the arbitrator to the conduct of ALPA's officials two years later in integration proceedings.

We do not deny that the record suggests —as DOT said—the *possibility* of bad faith; so, for that matter, do mere allegations. A *prima facie* case, however, requires more than a showing of mere possibility; it means that if no rebuttal evidence is submitted, the proponent has met his burden of proof and is entitled to prevail. *See* 9 WIGMORE ON EVIDENCE § 2494 at 379–80 (Chadbourn rev. 1981). An employee alleging a breach of the duty of fair representation in circumstances such as those we confront here must offer evidence showing both that he is entitled to better economic treatment, *see e.g., Vaca v. Sipes,* 386 U.S. 171, 193, 87 S.Ct. 903, 918, 17 L.Ed.2d 842 (1967), and that arbitrary or bad-faith conduct on the part of the union contributed to his injuries. *See e.g., Hines v. Anchor Motor Freight,* 424 U.S. 554, 564–67, 96 S.Ct. 1048, 1056–58, 47 L.Ed.2d 231 (1976); *Wood v. International Bhd. of Teamsters,* 807 F.2d 493, 500, 502 (6th Cir. 1986), *cert. denied,* 483 U.S. 1006, 107 S.Ct. 3232, 97 L.Ed.2d 738 (1987); *DeBoles v. Trans World Airlines,* 552 F.2d 1005 (3d Cir.), *cert. denied,* 434 U.S. 837, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977). We do not see how DOT could reasonably have concluded that the pilots' showing meets that standard. Baker and Rogers' theory of entitlement to greater seniority credit on the basis of the prior arbitrator's award, we have noted, is not persuasive. And the record "showed" neither bad faith on the part of ALPA's officials during integration proceedings nor any indication that such bad faith, if it existed, tainted the ALPA panel's integration decision.

We are thus obliged to vacate the DOT order compelling arbitration and remand the case for a fresh agency evaluation of the record evidence. We are, of course, aware that, subsequent to the entry of DOT's arbitration order, the Texas district court has now issued its final "Findings of Fact and Conclusions of Law" in the parallel civil action brought by Baker and Rogers, *see Rogers v. Air Line Pilots Ass'n Int'l,* Civ. No. H–84–3985 (Mar. 24, 1989), and on remand DOT may very well rely on those findings. But we are clearly not at liberty to sustain DOT's arbitration order based on considerations not presented to the Department. The task of reviewing the available evidence of record to determine whether arbitration is appropriate is DOT's, and not ours, in the first instance. *See SEC v. Chenery Corp.,* 318 U.S. 80, 87, 95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943).

## III.

■ Fifteen years ago in *Carey v. O'Donnell,* we held that section 408 of the Federal Aviation Act granted the CAB exclusive jurisdiction over "matters of airline merger, including the fair and equitable integration of seniority list, ... subject *only* to review in the courts of appeals." 506 F.2d 107, 110 (D.C.Cir.1974), *cert. denied,* 419 U.S. 1110, 95 S.Ct. 783, 42 L.Ed. 2d 806 (1975). We therefore affirmed the dismissal of a series of claims brought in district court collaterally attacking the fairness of the merger between Delta Airlines and Northeast Airlines, including challenges predicated upon the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634 (1982), as well as the duty of fair representation, *id.* at 109, 111. Describing the action instituted by Baker and Rogers in the district court in Houston as just such

a collateral attack on a matter within DOT's (and subsequently the courts of appeals') exclusive jurisdiction, ALPA seeks an injunction under the All Writs Act preventing the two pilots from enforcing any district court judgment or otherwise further prosecuting their Houston lawsuit. *See* 28 U.S.C. § 1651(a) (1982).

ALPA relies on *FTC v. Dean Foods Co.,* 384 U.S. 597, 86 S.Ct. 1738, 16 L.Ed.2d 802 (1966), a landmark case in which the Supreme Court set forth the guiding principles under which federal courts may exercise power to preserve their present or prospective jurisdiction:

> The All Writs Act, 28 U.S.C. § 1651(a), empowers the federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." The exercise of this power "is in the nature of appellate jurisdiction" where directed to an inferior court, *Ex parte Crane,* 5 Pet. 190, 193 (1832) (Marshall, C.J.), and extends to the potential jurisdiction of the appellate court where an appeal is not then pending but may be later perfected. Cf. *Ex parte Bradstreet,* 7 Pet. 634 (1833) (Marshall, C.J.).

384 U.S. at 603, 86 S.Ct. at 1742. In *Dean Foods,* the Supreme Court held that a regional court of appeals was empowered, at the request of the FTC, to "enjoin the consummation of a merger" then under antitrust scrutiny by the Commission. *Id.* at 599, 86 S.Ct. at 1740. The " 'limited judicial power to preserve the court's jurisdiction or maintain the *status quo* ... [was] deemed merely incidental to the courts' jurisdiction to review final agency action.' " *Id.* at 604, 86 S.Ct. at 1742 (quoting *Arrow Transp. Co. v. Southern Ry. Co.,* 372 U.S. 658, 671 n. 22, 83 S.Ct. 984, 991 n. 22, 10 L.Ed.2d 52 (1963)); *see also Wagner v. Taylor,* 836 F.2d 566, 571 (D.C. Cir.1987). ALPA claims it is asking for no more than a *Dean Foods* injunction. If Baker and Rogers are permitted to pursue their federal action in Houston to judgment, we are told, relief might be ordered in that lawsuit that would implicitly "conflict" with our order in the instant case disposing of the pilots' arbitration claim

before DOT. If arbitration is eventually ordered by DOT, and an arbitrator's award differs from the district court's order of relief on the fair representation claim, the courts of appeals' authority subsequently to review that award would be impaired.

ALPA's position, of course, assumes a good deal that may never come to pass— that the *pilots* will press ahead for a DOT order directing arbitration rather than ask DOT to hold the case in abeyance while the Houston district court proceeds to judgment (in which case arbitration may be redundant); that *DOT* will, in fact, order arbitration rather than delay action on the pilots' petition awaiting the completion of the parallel litigation; and that if arbitration is ordered the *arbitrator* will choose to grant different and inconsistent relief than that granted by the district court. Only if DOT sustains an arbitral award of affirmative relief that cannot be implemented by the parties in conjunction with a district court order will a conflict eventuate. If any one of the above contingencies does not occur, no conflict will be presented and that alone suggests the inappropriateness of the requested injunction.

Even should we postulate a future conflict between an arbitrator's award and a district court order, we cannot assume that it would interfere with DOT's administration of the Act, nor can we assume that it would necessarily implicate this court's jurisdiction. Unlike *Dean Foods,* where the FTC's primary concern was to protect its own jurisdiction to review the proposed merger, DOT takes no position on the question as to whether it has exclusive jurisdiction to deal with fair representation claims arising out of the integration of airline seniority lists. Indeed, since it seems to have largely discontinued the practice of imposing those conditions—and it never regarded itself as an expert on labor relations anyway—it would be somewhat surprising if DOT were now to embrace *Carey's* theory of exclusive agency jurisdiction. *Compare Air Line Pilots Ass'n v. Dep't of Transp.,* 791 F.2d at 176–78 (upholding DOT's refusal to impose LPPs) *with Air Line Pilots Ass'n v. Dep't of Transp.,* 838

F.2d 563, 567 (D.C.Cir.1988) (holding arbitrary and capricious DOT's refusal to impose LPPs in circumstances where unions of combining carriers might lose certifications).

*This* court's future jurisdiction would not inevitably be implicated by the prospect of conflicting remedial orders because we cannot know whether any DOT order granting (or denying) arbitration or an arbitration award itself would be appealed to this circuit. Petitions for review of orders of the Transportation Department may be brought in any of the courts of appeals (except the Federal Circuit), 49 U.S.C.App. § 1486(a), (b) (1982), and it cannot be thought that an injunction would be necessary to protect the appellate jurisdiction of *any one* of the courts of appeals, *see Dean Foods Co.*, 384 U.S. at 604–05, 86 S.Ct. at 1742–43; 16 C. WRIGHT, A. MILLER, E. COOPER & E. GRESSMAN, FEDERAL PRACTICE & PROCEDURE: JURISDICTION § 3932 at 192–93 (1977), because there is a split of authority in the circuits as to whether DOT's jurisdiction (and derivatively the courts of appeals' appellate jurisdiction) is exclusive with respect to fair representation claims arising out of airline mergers.[5] Although three circuits have agreed with *Carey, see Cook v. Pan American World Airways, Inc.*, 771 F.2d 635 (2d Cir.1985), *cert. denied*, 474 U.S. 1109, 106 S.Ct. 895, 88 L.Ed.2d 929 (1986); *Kesinger v. Universal Airlines*, 474 F.2d 1127 (6th Cir.1973); *Oling v. Air Line Pilots Ass'n*, 346 F.2d 270 (7th Cir. 1964), *cert. denied*, 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339 (1965), and at least one other circuit has reached the same result under the Interstate Commerce Act, *see Railway Carmen v. CSX Transp.*, 855 F.2d 745 (11th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1130, 103 L.Ed.2d 192 (1989); *see also United Transp. Union v. Norfolk & West. Ry.*, 822 F.2d 1114 (D.C. Cir.1987), *cert. denied*, —— U.S. ——, 108

S.Ct. 700, 98 L.Ed.2d 651 (1988), the Eighth and Ninth Circuits have rejected this reasoning. *See Clayton v. Republic Airlines, Inc.*, 716 F.2d 729 (9th Cir.1983); *Augsburger v. Locomotive Eng'rs*, 510 F.2d 853 (8th Cir.1975) (Interstate Commerce Act). The Fifth Circuit, in which Baker and Rogers brought their action, has not yet decided whether all "matters of airline merger," including questions concerning the fairness of a seniority integration, lie within the exclusive jurisdiction of the Department of Transportation. The district court in Houston declined to dismiss the pilots' claims, preferring to follow the Ninth Circuit's rule (contrary to ours) which it thought supported by Fifth Circuit cases holding that the "judicially created" cause of action for breach of the duty of fair representation is not within the exclusive jurisdiction of the National Labor Relations Board. *See Rogers v. Air Line Pilots Ass'n*, 647 F.Supp. 195, 196–97 (S.D.Tex.1985) (citing *Mumford v. Glover*, 503 F.2d 878, 883 (5th Cir. 1974) and *Smith v. Local 25, Sheet Metal Workers Int'l Ass'n*, 500 F.2d 741, 747 (5th Cir.1974)). *But see Holman v. Southern Airways, Inc.*, 210 F.Supp. 407, 409–11 (N.D.Ga.1962) (dismissing "collateral attack" on CAB orders when petition for review of orders was pending in D.C.Circuit).

The dissent asserts that *Carey* is the only case in *any* of the circuits "squarely on point," and that we are therefore obliged to issue an injunction in its service. But the distinction drawn by the dissent between the facts of *Carey* and those confronted by the Eighth and Ninth Circuits is unpersuasive. Although it is true that the Eighth and Ninth Circuits were not presented with simultaneous employee actions before DOT and a federal district court, it is quite unlikely that those circuits would preclude concurrent litigation in

---

5. The dissent concedes that we should be reluctant "to enjoin a litigant with no case potentially before us from proceeding in a circuit that had imposed no restrictions on cogenerating litigation and arbitration simultaneously." Dissent at 504. But as the dissent acknowledges, *see* Dissent at 506, once an arbitration petition has been filed with DOT, any follow-on petition for

review "potentially" can come before us, for jurisdiction lies in any of the regional courts of appeals. *See supra* p. 501. There is thus no room in the dissent's position for the considerations of "prudence and comity" that the dissent agrees must "shape our decision" as to whether to exercise injunctive power. Dissent at 504.

view of their conclusion that DOT's jurisdiction over unfair representation claims growing out of airline mergers is not exclusive. (The Ninth Circuit in *Clayton,* in fact, specifically adverted to the possibility of multiplicitous actions. *See Clayton,* 716 F.2d at 732.) Of course, under their regime of concurrent jurisdiction, those circuits might well hold DOT's determinations conclusive under principles of issue preclusion (assuming DOT finished first). *See, e.g., United States v. Utah Construction & Mining Co.,* 384 U.S. 394, 421–22, 86 S.Ct. 1545, 1599–60, 16 L.Ed.2d 642 (1966) (collecting cases); Restatement (Second) of Judgments § 83 (1982). But it would seem strange for the Eighth and Ninth Circuits to hold federal court and agency jurisdiction concurrent and yet require aggrieved employees irrevocably to choose one or the other route—DOT for their LPP claims or federal court for their fair representation claims.[6] In any event, even if the dissent were correct about the limited scope of the Eighth and Ninth Circuit decisions (and, perhaps, the Fifth Circuit's views), it is not at all clear that our sister circuits would halt federal proceedings in favor of DOT's process in every case. Particularly where the federal litigation has advanced nearly to judgment and the agency has yet to begin (we are today directing DOT, in essence, to start over), the equities would seem to lie in favor of leaving the district court action intact. *Cf. Columbia Plaza*

*Corp. v. Security Nat'l Bank,* 525 F.2d 620, 626–29 (D.C.Cir.1975).

ALPA's request for an injunction, thus, cannot be seen as a genuine effort to protect DOT's jurisdiction or the jurisdiction of this court, but rather as a thinly-veiled attempt to impose D.C. Circuit substantive law on a federal district court in Texas. As such, ALPA's claim is quite tenuous. To be sure, we may have the power to enjoin proceedings in a district court in another circuit (or restrain the parties from maintaining those proceedings). *See Environmental Defense Fund, Inc. v. EPA,* 485 F.2d 780, 783 (D.C.Cir.1973); *see also Toledo Scale Co. v. Computing Scale Co.,* 261 U.S. 399, 426, 43 S.Ct. 458, 465, 67 L.Ed. 719 (1923). But exercise of that power—with all of its troubling implications—should be confined to circumstances where the circuits involved are in agreement as to the standard by which the lower court's assumption of jurisdiction is to be judged, or where parallel actions are instituted in virtual contempt of the jurisdiction of the court issuing the writ, *see, e.g., Toledo Scale Co.,* 261 U.S. at 425–27, 43 S.Ct. at 465–66. We have neither situation here. *But cf. Columbia Plaza Corp. v. Security Nat'l Bank,* 525 F.2d 620, 626–29 (D.C.Cir. 1975) (discussing standards under Fed.R. Civ.P. 13(a) for enjoining proceedings in actions involving same subject matter).

Although Baker and Rogers brought parallel proceedings before DOT and the federal district court in Houston,[7] they may

---

**6.** A rule against simultaneous actions would seem especially unlikely in those circuits given the uncertain contours of the relief available to an aggrieved employee before DOT. While "make-whole," as well as injunctive, relief is available in federal court, *see, e.g., Steele v. Louisville & Nashville R.R. Co.,* 323 U.S. 192, 207, 65 S.Ct. 226, 234, 89 L.Ed. 173 (1944) (providing for "usual judicial remedies of injunction and award of damages" in fair representation claims); *Vaca v. Sipes,* 386 U.S. 171, 196, 87 S.Ct. 903, 920, 17 L.Ed.2d 842 (1967) (holding that damages and injunctive relief may be awarded in fair representation cases when necessary to make employees whole), we have been unable to ascertain whether (and in what amount) damages may be awarded by arbitrators for unfair seniority integrations under §§ 3 and 13 of the LPPs. Moreover (and this may explain the position ALPA advances today), since the LPPs are part of a package of condi-

tions imposed on the merging *carriers,* it is particularly unclear whether a DOT arbitrator may award damages against the union.

**7.** Venue for the two pilots' fair representation claims may have been proper only within the Fifth Circuit. The federal venue statute provides:

A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district where all defendants reside, or in which the claim arose, except as otherwise provided by law.

28 U.S.C. § 1391(b) (1982). Both defendants in the pilots' district court fair representation action—ALPA and Continental—do business within Houston, Texas, although it is unclear whether they have common residences in other judicial districts. *See Rogers v. Air Line Pilots Ass'n Int'l,* C.A. No. H–84–3985, slip op. at 2–3 (Mar.

well have been entitled to do so in the Fifth Circuit, just as they would be in the Eighth or Ninth. And it was not the pilots who invoked this court's jurisdiction to review DOT's order; it was ALPA who exercised its statutory right to gain review in the D.C. Circuit rather than one of the other regional circuits. Now, ALPA wishes to parlay that option, in effect, into relief more properly sought in the Fifth Circuit, or the Supreme Court. For the necessary implication of the requested injunction, were we to issue it, would be to impair the rights of plaintiffs in circuits that permit parallel proceedings to pursue that course until the Supreme Court instructs otherwise.

ALPA has carefully framed the relief it requests as "a compulsory injunction ... aimed at private parties," *Dean Foods Co.,* 384 U.S. at 605 n. 3, 86 S.Ct. at 1743 n. 3, but we think it is more accurately characterized as a writ of mandamus which essentially aims "to confine an inferior court to a lawful exercise of its prescribed jurisdiction." [8] *Will v. United States,* 389 U.S. 90, 95, 88 S.Ct. 269, 273, 19 L.Ed.2d 305 (1967). We have no general supervisory authority, unlike the Fifth Circuit Court of Appeals, to so confine a district court in Houston; many courts, in fact, have suggested that the power to issue the writ does not extend

across circuit lines. *See In re Ojeda Rios,* 863 F.2d 202, 204 (2d Cir.1988) (concluding that Second Circuit has no jurisdiction to issue writ of mandamus to district court sitting in First Circuit); *General Elec. Co. v. Byrne,* 611 F.2d 670, 672 (7th Cir.1979) ("We are aware of no statute or decision which would authorize us to issue a writ of mandamus directed to a district judge sitting in another circuit."); *In re Virginia Elec. Power Co.,* 539 F.2d 357, 365 (4th Cir.1976) ("The All Writs Statute authorizes this court to issue writs of mandamus to district courts in the circuit."). In any event, "[t]he remedy of mandamus is a drastic one, to be invoked only in extraordinary situations." *See Kerr v. United States District Court,* 426 U.S. 394, 402, 96 S.Ct. 2119, 2123, 48 L.Ed.2d 725 (1976). At an irreducible minimum, a petitioner must show its right to issuance of such a writ is "clear and indisputable." *Bankers Life & Cas. Co. v. Holland,* 346 U.S. 379, 384, 74 S.Ct. 145, 148, 98 L.Ed. 106 (1953) (quoting *United States v. Duell,* 172 U.S. 576, 582, 19 S.Ct. 286, 287, 43 L.Ed. 559 (1899)). Our prior discussion should make it quite clear that petitioner falls a good deal short of meeting that burden. We think ALPA's dispute with the district court in Houston must be pursued in the Fifth Circuit.[9]

---

24, 1989). The causes of action presumably arose in Texas as well.

**8.** In a long line of cases catalogued in *Steelman v. All Continent Corp.,* 301 U.S. 278, 291, 57 S.Ct. 705, 710, 81 L.Ed. 1085 (1937), the Supreme Court maintained the distinction between restraints operating against parties and restraints "of the court itself." *Id.* In *Dean Foods,* however, the Court appeared to recognize the practical identity between the two types of injunctive relief. *See Dean Foods Co.,* 384 U.S. at 605, 86 S.Ct. at 1743 ("Of course, the courts of appeals have traditionally framed § 1651(a) writs in the form of compulsory injunctions against private parties."). In either event, the result is the same, for an injunction issued by one court against the parties to litigation in another forum "in effect ... acts to restrain the other court and therefore represents an interference with the jurisdiction of another tribunal." 11 C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE § 2942 at 377–78 (1973).

**9.** If conflicting affirmative remedial orders were eventually to issue as a result of parallel DOT-federal court proceedings, ALPA might be

entitled (depending on whether its residence or principal place of business is located in the Fifth Circuit, *see* 49 U.S.C. § 1486(b) (1982))—though not required—to seek review of DOT's order in the Fifth Circuit, which presumably would be able to reconcile the conflict. We note as well that ALPA waited almost five years after the pilots' fair representation lawsuit was instituted in 1984 before it requested an injunction against further prosecution of that federal action. This weakens its claim for injunctive relief considerably. While ALPA did move for dismissal of the pilots' claims in district court shortly after the action was filed, it took no additional steps until a little more than one week before oral argument in this case, when it lodged the instant motion. By that time, trial in Houston had long since concluded and the district court had already issued proposed findings of fact and conclusions of law, all of which were finalized but a few days after ALPA moved in our court to enjoin Baker and Rogers from pursuing the action further. *See, e.g., Technitrol, Inc. v. McManus,* 405 F.2d 84, 87 (8th Cir.1968) ("unreasonable delay standing alone is a sufficient basis for ... refusal to entertain the writ" of mandamus).

Accordingly, we deny ALPA's motion for an injunction, but grant its petition for review. The order under review is hereby vacated and the cause remanded for further proceedings consistent with this opinion.

*So ordered.*

MIKVA, Circuit Judge, concurring is part and dissenting in part:

I concur in my colleague's well reasoned conclusion that the order of the U.S. Department of Transportation ("DOT" or "agency") directing arbitration was invalid. I cannot agree, however, that we are at liberty under our controlling precedent, *Carey v. O'Donnell,* 506 F.2d 107 (D.C.Cir. 1974), *cert. denied,* 419 U.S. 1110, 95 S.Ct. 783, 42 L.Ed.2d 806 (1975), to allow parties to continue federal district court litigation while simultaneously maintaining arbitration petitions. I would grant the Air Line Pilots Association ("ALPA") the injunction it seeks to prevent such multifariousness.

In *Carey v. O'Donnell,* this court rejected a collateral attack "in the District Court or any other forum," 506 F.2d at 110, on an integrated seniority list resulting from an airline merger. We found that Congress had created "a statutory scheme whereby matters of airline merger, including the fair and equitable integration of seniority lists, are vested in the Civil Aeronautics Board, subject *only* to review in the courts of appeals." *Id.* (emphasis in original) We reached this decision as a matter of statutory interpretation, whatever the limits on relief available to an aggrieved employee in arbitration before DOT, *see* Majority opinion ("Maj. op.") at 502 n. 6. Thus, although I doubt whether the limits on relief hypothesized by the majority in fact exist, this issue does not affect the vitality of *Carey.* *See American Airlines, Inc. v. CAB,* 445 F.2d 891, 896–97 (2d Cir.1971) (Friendly, C.J.) (suggesting that DOT arbitration can be made binding on union), *cert. denied,* 404 U.S. 1015, 92 S.Ct. 681, 30 L.Ed.2d 663 (1972); *Transport Workers of America v. CAB,* 725 F.2d 775, 779 (D.C.Cir.) (same), *cert. denied,* 469 U.S. 818, 105 S.Ct. 87, 83 L.Ed.2d 33 (1984); *Hyland v. United Air Lines, Inc.,* 254 F.Supp. 367, 373 (N.D.Ill. 1966) (stating that CAB "would fully hear the subject matter of [a] complaint" against union and carrier which requested make-whole relief, including damages). We said in *Carey* that when the jurisdiction of the agency is triggered with its concomitant arbitration procedure, no separate court proceeding can be pursued. Only by ignoring this precedent, squarely on point to the case *sub judice,* can the majority reach the result it does today. That DOT is apparently willing to abdicate its statutory responsibility as exclusive arbiter of fair representation claims, *see* Maj. op. at 499, cannot excuse the majority's failure to vindicate the principle embodied in *Carey.* Our institutional role as judges requires us to uphold our prior decisions and to apply the statutory scheme ordained by Congress. It is as simple as that.

There can be no serious doubt that we have the power to enjoin a party from proceeding before a federal district court in another circuit. The All Writs Act, 28 U.S.C. § 1651(a), makes that authority clear. *See Toledo Scale Co. v. Computing Scale Co.,* 261 U.S. 399, 426, 43 S.Ct. 458, 465, 67 L.Ed. 719 (1923); *Environmental Defense Fund, Inc. v. EPA,* 485 F.2d 780, 783 (D.C.Cir.1973) (*per curiam*).

I recognize that considerations of prudence and comity must shape our decision whether and how to exercise that power. I also realize that we are neither infallible nor final, and I respect the prerogative of our sister circuits to interpret the law differently from us. Indeed, I would hesitate to enjoin a litigant with no case potentially before us from proceeding in a circuit that had imposed no restrictions on cogenerating litigation and arbitration simultaneously. But that is scarcely the situation here.

No court of appeals, in the Fifth Circuit or elsewhere, has ever ruled that a litigant may pursue the same fair representation claim *simultaneously* before a court and DOT. The Ninth Circuit did allow litigation to continue in *Clayton v. Republic Airlines, Inc.,* 716 F.2d 729, 730 (9th Cir. 1983), but there was no ongoing CAB proceeding: "[p]laintiffs did not seek review

of the arbitration award with the CAB." The same situation existed in *Augsburger v. Brotherhood of Locomotive Engineers,* 510 F.2d 853, 856 (8th Cir.1975). By contrast, *Carey* confronted precisely this type of dual-track litigation strategy, *see Northeast Master Executive Council v. CAB,* 506 F.2d 97 (1974) (companion case affirming CAB order), *cert. denied,* 419 U.S. 1110, 95 S.Ct. 783, 42 L.Ed.2d 806 (1975). I do not believe that we should turn a blind eye to our own circuit precedent, which is the only authority squarely on point, on the basis of *speculation, see* Maj. op. at 500–01, that the Fifth Circuit may go where no circuit has gone before and allow litigation in federal court simultaneously with arbitration before the agency.

Indeed, a different district court in the Fifth Circuit held that it lacked jurisdiction to enjoin the seniority and job retention provisions of an airline collective bargaining agreement that were the subject of CAB orders then under appeal in this court, *see Holman v. Southern Airways, Inc.,* 210 F.Supp. 407, 409–11 (N.D.Ga.1962). The court was "convinced that it [did] not have jurisdiction to grant the plaintiffs the relief they [sought]," and advised them that their "proper remedy" was to pursue their petition for review of the CAB's order in this court, 210 F.Supp. at 410, 411. *Holman* was not even cited by the Houston district court in its opinion on jurisdictional issues, *see Rogers v. Air Line Pilots Ass'n,* 647 F.Supp. 195, 196–97 (S.D.Tex.1985). Fifth Circuit law does not provide the clear and unambiguous statement that I believe would be necessary in order for us, on prudential grounds, even to consider declining to follow our own circuit precedent.

It is immaterial that there is no certainty of conflict between the DOT arbitration and the judicial proceeding in Texas, or that the agency's arbitration order might not be appealed to this circuit. The mere *possibility* of the invasion of this court's jurisdiction to review DOT's final order is sufficient ground on which to issue an injunction. In *FTC v. Dean Foods Co.,* 384 U.S. 597, 86 S.Ct. 1738, 16 L.Ed.2d 802 (1966), the Supreme Court held that a regional court of appeals had the power to enjoin a proposed merger that was under review by the Federal Trade Commission. There was no guarantee that the merits of that case would ever reach a court of appeals: the proposed merger might have collapsed at the last minute, or the FTC might have reconsidered its complaint. The authority of an appellate court "is not confined to the issuance of writs in aid of a jurisdiction already acquired by appeal but extends to those cases which are within its appellate jurisdiction although no appeal has been perfected." *Roche v. Evaporated Milk Ass'n,* 319 U.S. 21, 25, 63 S.Ct. 938, 941, 87 L.Ed. 1185 (1943); *see also McClellan v. Carland,* 217 U.S. 268, 279–80, 30 S.Ct. 501, 503–04, 54 L.Ed. 762 (1910) (writ may issue "before the appellate court has actually obtained jurisdiction of the case" on the ground that the action *"might* have been taken on appeal to the Circuit Court of Appeals") (emphasis added).

The possibility that a petition for review of DOT's final order might be filed in some other circuit is no different from any of the other reasons why eventual review in this court is not a certainty, and it similarly does not affect our ability to issue an injunction. Otherwise, the fact that review might be sought in *any* circuit (except the Federal) would mean that *"no* court could do anything [and therefore] would lead to complete frustration." *Board of Governors of the Federal Reserve System v. Transamerica Corp.,* 184 F.2d 311, 316 (9th Cir.) (emphasis added), *cert. denied,* 340 U.S. 883, 71 S.Ct. 197, 95 L.Ed. 641 (1950). The powers of the federal courts are not so ephemeral.

Although the petitioning party in this case is the union, ALPA, it was the pilots, Baker and Rogers, who created the anomalous and difficult situation confronting us, by seeking relief both in the Southern District of Texas and before DOT. The pilots knew, or should have known, that this dual-track strategy created the risk that ALPA would petition for review of DOT's order in this court (especially in view of our previous holding in *Carey),* and that the pilots would need to seek our aid in safeguarding the relief they obtained from DOT. If the

506

pilots had not sought an order directing arbitration before DOT, no follow-on petition for review could come before us, *cf.* Maj. op. at 501 n. 5, and this would be a far more troublesome case.

A decision to enjoin a party from proceeding before a district court in another circuit cannot be made lightly, and I am not unmindful of my colleagues' reluctance to exercise this court's power under the All Writs Act. But any such reluctance is overwhelmed by our constant commitment to the binding law of this circuit. When the precedent in question is the only precedent in *any* circuit that is directly on point to the case *sub judice,* it becomes unseemly for our court to take any other course but to follow circuit law. I respectfully dissent.